753 So.2d 181 (2000)
In re Judge Larry D. JEFFERSON, Monroe City Court, State of Louisiana.
No. 99-0-1313.
Supreme Court of Louisiana.
January 19, 2000.
Rehearing Denied February 18, 2000.
*183 Steven Robert Scheckman, Special Counsel, Mary Frances Whitney, Asst. Special Counsel.
Nancy C. Rix, Commission Legal Counsel, Hugh M. Collins, PhD., Chief Executive Officer.
Daryl Blue, Monroe, Counsel for Respondent.

ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
KIMBALL, J.[*]
This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana ("Commission") that Judge Larry Jefferson ("Judge Jefferson") of the City Court of Monroe, Parish of Ouachita, State of Louisiana, be removed from judicial office and be ordered to reimburse and pay to the Commission costs incurred in the investigation and prosecution of this case. After a thorough review of the record, we find that Judge Jefferson's conduct violated Canons 1, 2(A), 3(A)(1), (2), (3), 3(B)(1) of the Code of Judicial Conduct as well as the constitutional standard articulated in La. Const. art. V, § 25(C). We additionally find that the most severe discipline is warranted in this case because Judge Jefferson repeatedly engaged in conduct that was prejudicial to the administration of justice that brings the judicial office into disrepute. Accordingly, we order that Judge Jefferson be removed from office and that his office be declared vacant. Judge Jefferson is additionally assessed costs in the amount of $4,333.00.

FACTS AND PROCEDURAL HISTORY
Judge Jefferson commenced his initial term as Division A Judge for the Monroe City Court on January 1, 1991. He was re-elected to that office in November of 1996. The record does not indicate that Judge Jefferson engaged in any reported misconduct prior to mid-1997. In 1997, however, the Commission began receiving anonymous complaints that Judge Jefferson had engaged in misconduct. After an initial investigation into these complaints, the Commission determined formal charges against Judge Jefferson were warranted.
On September 25, 1998, the Commission formally charged Judge Jefferson with the following violations:
Charge I: Judge Jefferson abused his authority as a judge with respect to the City Prosecutor for the Monroe City Court and the Clerk of Court for the Monroe City Court by exceeding his contempt power and/or abusing such contempt power, which demonstrates a lack of proper judicial temperament and demeanor. These actions violated Canons 1, 2, 3(A)(1), (2), (3) and 3B(1) of the Code of Judicial Conduct and La. Const. art. V, § 25C in that the actions were willful misconduct relating to the judge's official capacity and were persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute. The Commission also charged the judge with violating C.Cr.P. arts. 21-25 relative to direct and constructive contempt and C.C.P. art. 222 and 224 relative to direct and constructive contempt.
Charge II: Judge Jefferson abused and exceeded his authority as a judge when he banned the City Prosecutor from his courtroom and subsequently dismissed 41 cases. His conduct violated Canons 1, 2, and 3A(1), (2), and (3) of the Code of Judicial Conduct and La. Const. Art. V, § 25C in that he engaged in willful misconduct relative to his office and engaged in public conduct prejudicial to the administration of justice that brought the judicial office into disrepute.

*184 Charge III: Judge Jefferson engaged in the unauthorized practice of law in violation of La.R.S. 13:1952, Canons 1, 2, 3A(1) and La. Const. art. V, § 25C, in that he engaged in willful misconduct relating to his official duty and in public conduct prejudicial to the administration of justice.
On November 25, 1998, the Commission filed an additional charge against Judge Jefferson:
Charge IV: That Judge Jefferson failed to comply with the order of May 28, 1998, issued by the Louisiana Supreme Court, pursuant to which he was relieved of all administrative duties at Monroe City Court. This was in violation of Canons 1, 2, 3(A)(1) and 3(B)(1) of the Code of Judicial Conduct and La. Const. art. V, § 25C, in that he engaged in willful misconduct relating to this official duty and in persistent and public conduct prejudicial to the administration of justice.
A hearing on the merits was held before the Commission on February 26 and 27, 1999. On May 5, 1999, the Judiciary Commission rendered its findings of fact and conclusions of law pursuant to those proceedings. The Commission concluded that Judge Jefferson's "pattern and practice of abusing his authority" and his unauthorized practice of law violated Canons 1, 2(A), 3(A)(1), (2), (3), and 3(B)(1) of the Code of Judicial Conduct, and La. Const. art. V, § 25(C). Based on these findings, the Commission recommended that Judge Jefferson be removed from the bench and be ordered to reimburse the Commission the costs incurred in the investigation and prosecution of this case.

JURISDICTION AND BURDEN OF PROOF
This Court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. 5, § 25(C), which provides:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
This Court, pursuant to its supervisory authority over all lower courts, adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996. This Code is binding on all judges and violations of its Canons may serve as the basis for the disciplinary action provided for by La. Const. art. 5, § 25(C). In re Bowers, 98-1735, p. 7 (La.12/1/98), 721 So.2d 875, 879; In re Quirk, 97-1143, p. 4 (La.12/12/97), 705 So.2d 172, 176; In re Marullo, 96-2222, p. 3 (La.4/8/97), 692 So.2d 1019, 1021; In re Decuir, 95-0056, p. 7 (La.5/22/95), 654 So.2d 687, 692.
The charge or charges against a judge must be proven by clear and convincing evidence before this Court can impose discipline. In re Bowers, 98-1735 at p. 7, 721 So.2d at 880; In re Johnson, 96-1866, p. 7 (La.11/25/96), 683 So.2d 1196, 1199; In re Huckaby, 95-0041, p. 6 (La.5/22/95), 656 So.2d 292, 296. This *185 standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Bowers, 98-1735 at p. 7, 721 So.2d at 880; In re Quirk, 97-1143 at p. 4, 705 So.2d at 176; In re Huckaby, 95-0041 at p. 6, 656 So.2d at 296.

ANALYSIS

Charge I: Abuse of contempt power and authority as a judge
In Charge I, the Commission charged Judge Jefferson with abusing his authority as a judge by exceeding his contempt power and abusing such contempt power with respect to the City Prosecutor and the Clerk of Court for the Monroe City Court. The Commission found that such acts demonstrated Judge Jefferson's lack of proper judicial temperament and demeanor under the circumstances. Charge I includes three incidents involving Judge Jefferson, the prosecutor, James Rodney Pierre, and the Clerk of Court, Ms. Powell-Lexing, in which the judge held these individuals in contempt of court.

A. Contempt Proceeding on April 2, 1997.

On April 2, 1997, Judge Jefferson recalled a bench warrant against a criminal defendant he had previously issued and reset the defendant's court date. The prosecutor for the Monroe City Court, Mr. Pierre, was advised of this action and told that he should report to Judge Jefferson's office to discuss the change. At that time, no proceedings or court sessions were scheduled that required the prosecutor's presence at the time ordered by the judge. Additionally, Mr. Pierre had not been subpoenaed to appear before the judge. There is a factual dispute as to whether Mr. Pierre replied that he would meet with the judge after he finished some paperwork or that he would not honor the new court date set by Judge Jefferson. According to Mr. Pierre, he told the secretary that he would be there "directly" after completing some paperwork. Judge Jefferson testified, however, that Mr. Pierre refused to honor the court date set by the judge. In any case, after learning that Mr. Pierre would not immediately honor his request for a meeting, Judge Jefferson issued a verbal order to the deputy marshal to bring Mr. Pierre to his courtroom at that time. When Mr. Pierre was brought into the courtroom, Judge Jefferson found Mr. Pierre in direct contempt of court, sentenced him to thirty days in jail and fined him $500.00. Judge Jefferson testified that he later rescinded his order after realizing that the sentence imposed was inappropriate. Mr. Pierre, however, was handcuffed and detained for several hours in a holding cell adjacent to the courtroom.
The laws providing for contempt citations do not apply in this instance. Therefore, Judge Jefferson's actions in this matter were clearly abusive of his authority. See La.C.Cr.P. art. 25(A) and La. C.C.P. art. 227 ("A person may not be adjudged guilty of a contempt of court except for misconduct defined as such, or made punishable as such, expressly by law."). Additionally, even if Judge Jefferson mistakenly believed a contempt citation was appropriate under these circumstances, he failed to follow any of the procedures outlined in the Code for the punishment of contempt and imposed a sentence that far exceeded the legally permissible punishment for an attorney in contempt. Among other omissions, Judge Jefferson did not afford Mr. Pierre an opportunity to be heard orally by way of defense or mitigation and did not render an order reciting the facts constituting the contempt. The contempt power wielded by judges is an awesome responsibility and, when exercising such power, judges must diligently and in good faith comply with the strictures of the law governing its execution. The failure to do so, as in this case, constitutes an abuse of the contempt power.

*186 B. Contempt Proceeding on May 8, 1997

On May 8, 1997, Judge Jefferson again held Mr. Pierre in contempt of court. At the conclusion of a criminal case before Judge Jefferson, in which Mr. Pierre was the prosecutor, and immediately prior to the commencement of another case, Judge Jefferson held Mr. Pierre in contempt for failing to request permission before leaving the courtroom to console a witness who was disappointed with the outcome of the previous case and for turning his back on Judge Jefferson when the judge was explaining why such behavior was unacceptable. Again, without affording Mr. Pierre the opportunity to be heard or telling him why he was being held in contempt,[1] Judge Jefferson found Mr. Pierre in contempt of court, imposed a sentence of twenty-four hours in jail, and ordered him immediately transported to jail. Mr. Pierre was handcuffed, booked, and detained at the Monroe City Jail. Although the Fourth Judicial District Court for the Parish of Ouachita subsequently issued a stay order suspending Mr. Pierre's sentence, Mr. Pierre was detained for several hours. At some point thereafter, Judge Jefferson stayed the proceedings and the execution of the contempt order. He also ordered Mr. Pierre not to discuss the matter with anyone outside the presence of the court. Notwithstanding this order, the local newspapers printed several articles regarding "the feud" and the resulting chaos between Judge Jefferson and Mr. Pierre.
Pretermitting the issue of whether Mr. Pierre's actions were contemptuous in this issue, we find the procedures utilized by Judge Jefferson in punishing Mr. Pierre's behavior did not even begin to comport with the procedures required for the punishment of contempt and, therefore, as discussed above, amounted to an abuse of the contempt power. Furthermore, Judge Jefferson's actions totally disrupted the proceedings scheduled for court that day and prevented the orderly administration of justice.
The record reflects that Judge Jefferson ordered Mr. Pierre and his staff "not to discuss the case with the media." The issuance of this order was not supported in law, was motivated by the judge's desire that his questionable behavior not be publicized, and demonstrates a further abuse of power by the judge. Notwithstanding this order, Judge Jefferson's contempt findings were widely reported in the local media and consequently brought the judiciary into further disrepute.

C. Contempt Proceeding on May 15, 1998

On May 14, 1998, the Monroe City Court Clerk of Court, Carol Powell-Lexing, did not distribute the paychecks for Judge Jefferson and his staff at noon, the time she customarily distributed them. Instead, the checks were delivered when she returned from lunch. Later that afternoon, Judge Jefferson summoned Ms. Powell-Lexing to his office to answer questions regarding these and other issues.[2] When Ms. Powell-Lexing arrived, Judge Jefferson's secretary and a seventeen-year-old part-time employee were also in the judge's office. An audio tape of that meeting, which was surreptitiously made by Judge Jefferson, reveals that Judge Jefferson allowed his secretary to ask Ms. Powell-Lexing why her paychecks were delivered *187 "late" on May 14, 1998. When Judge Jefferson's secretary reprimanded Ms. Powell-Lexing in a loud and disparaging manner regarding the tardiness of the checks, Ms. Powell-Lexing walked out of the meeting, ignoring the judge's plea that she remain to further discuss the matter.
On May 15, 1998, the following afternoon, without any prior notice to Ms. Powell-Lexing, Judge Jefferson had a deputy marshal escort her to his courtroom from the court's parking lot. Upon her arrival in the courtroom, she was handed an order issued by Judge Jefferson requiring that she respond to the following questions:
1. Whether she has interfered with the operation of Division A of the court by deliberately withholding the paychecks of Judge Jefferson and his employees Ira Brown and Kenya Roberson on May 14, 1998.
2. Why she withheld from Ira Brown the password and code issued to Ira Brown by the City of Monroe for the computer system;
3. Why she deliberately withheld from Division A of the court information regarding the hiring of individuals in the clerk of court's office; and
4. Why she retaliated against court employees for having contact with Division A of the court.
At this hearing, Ms. Powell-Lexing was questioned on the record and an audio tape of that proceeding reveals that Judge Jefferson conducted himself in an argumentative and belligerent manner. At some point during this hearing in open court, Ms. Powell-Lexing refused to answer the judge's questions and asserted her Fifth Amendment privilege. Judge Jefferson responded by ordering Ms. Powell-Lexing "jailed" until she answered the judge's questions and by ordering her in "contempt of court." Ms. Powell-Lexing was then transported to the police station to be booked. After she arrived at the police station, Judge Jefferson ordered that she be returned to the courtroom whereupon the judge proceeded to further interrogate her in open court relative to questions set forth in the May 15, 1998 order that the judge deemed had not been answered to his satisfaction. Such interrogation ensued despite the fact that the judge had no authority to question her about the matters set forth in the order as he had been relieved of his administrative duties by the en banc order issued by the Monroe City Court and by the Fourth Judicial District Court's injunction against him from interfering with the Administrative Judge's responsibilities. At this time and with the assistance of counsel, Ms. Powell-Lexing responded to some of Judge Jefferson's questions. During the examination, Judge Jefferson stated to Ms. Powell-Lexing, "You're not a Judge, you might act like one, but you got whipped," referring to the clerk's unsuccessful campaign for judicial office. Additionally, Judge Jefferson told Ms. Powell-Lexing to "shut up" twice. At the conclusion of this interrogation, Judge Jefferson issued an order that the parties not speak about the matter outside the presence of his court. Notwithstanding this order, the local media widely reported the incident.
At the hearing before the Commission, Judge Jefferson admitted that there was no case pending involving Ms. Powell-Lexing and that she was not served with any order from Judge Jefferson until she was brought into his courtroom by the deputy. Clearly, Judge Jefferson's conduct amounted to an abuse of power and served only to unnecessarily intimidate and demean the clerk. As he did in the contempt proceedings on April 2, 1997, Judge Jefferson abused his contempt power by attempting to utilize such power under these circumstances and, in any case, ignoring the procedural protections afforded the individual charged with contempt. We therefore find Judge Jefferson abused the power of his office when he used his contempt power in an instance where there *188 was no proceeding before him as a judicial officer and to address an administrative matter. Furthermore, the public manner in which Judge Jefferson acted with respect to Ms. Powell-Lexing on May 15, 1998, created adverse publicity prejudicial to the administration of justice. The audio tapes of the proceeding at issue reveal that Judge Jefferson's tone of voice directed towards the clerk was injudicious, intemperate and abusive throughout. Furthermore, at the conclusion of the hearing, the judge issued an order prohibiting Ms. Powell-Lexing and her counsel from discussing the matter outside the presence of the court. The issuance of this order was not supported in law and demonstrates a further abuse of power by the judge.

D. Violations of Canons 1, 2, 3 A(1), (2), (3) and 3 B(1)

The Commission found that the above conduct of the judge violated Canons 1, 2, 3(A)(1)(2)(3) and 3(B)(1) of the Code of Judicial Conduct and La. Const. Art. V, § 25(C). We agree.
Canon 1, entitled "A judge shall uphold the integrity and independence of the Judiciary," provides that:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
Judge Jefferson violated Canon 1 in that he did not maintain or personally observe the high standards of conduct that preserve the integrity of the judiciary. Instead, he demanded that Mr. Pierre immediately meet with him regarding a nonemergency matter, which Judge Jefferson himself brought about, then erroneously held him in contempt of court for not obeying an improperly issued order that he was not obligated to obey. Furthermore, the judge utterly failed to follow the proper procedures for punishing an individual in contempt of court. Judge Jefferson also violated Canon 1 when he held Mr. Pierre in contempt for a second time. He again exceeded and abused his contempt power and judicial authority, thereby calling into question the integrity of the judiciary. He further violated Canon 1 when he used his judicial power to coerce a court employee, unconnected to any case before him, to answer questions about paychecks and other purely internal administrative issues. The judge's behavior, which was extensively reported by the local media, caused damage to the perceived independence and integrity of the Monroe City Court and to the judiciary as a whole.
Canon 2, entitled, "A judge shall avoid impropriety and the appearance of impropriety in all activities," provides:
(A) A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Judge Jefferson's conduct similarly violated Canon 2. First, Judge Jefferson did not respect or comply with the law when he held Mr. Pierre in contempt of court. As stated previously, the judge abused his contempt power on three separate occasions. Secondly, the judge's act of demanding that the city prosecutor attend a meeting scheduled at Judge Jefferson's whim, then hauling him into court and holding him in contempt for not doing so immediately, erodes the public's confidence *189 in the integrity and impartiality of the judiciary. We subscribe to the Commission's characterization of Judge Jefferson's conduct as undermining the judicial process by creating a public perception that a judge has "unbridled power to haul people into court and, if they fail to please him, to jail them." Judge Jefferson failed to respect and comply with the law when he misused his contempt power and judicial authority to the detriment of both Mr. Pierre and Ms. Powell-Lexing. His actions cannot be said to promote public confidence in the integrity and impartiality of the judiciary. To the contrary, such actions erode public confidence in the integrity of the judiciary. An editorial that aired on KNOE-TV is particularly troubling:
Apparently anyone who disagrees with Judge Jefferson is subject to jailing, at least according to the judge's way of thinking. These antics are getting tiresome and Jefferson's behavior reflects poorly not just on him but also damages the reputation of the entire court. Judge Jefferson needs to learn to deal with his fellow court employers in a rational, mature manner and not with threats and attempts at intimidation. When it comes to actions we think it's Judge Jefferson who's in contempt of court.
This editorial could have no effect other than to stigmatize Judge Jefferson's court and erode any public confidence in the integrity and impartiality of the judiciary in the minds of those citizens who either personally witnessed the conduct or who read about it in the newspaper or saw it on television.
For the above-stated reasons, we find that Judge Jefferson's conduct in holding Mr. Pierre and Ms. Powell-Lexing in contempt of court violated the mandates of Canon 2.
Canon 3, entitled, "A judge shall perform the duties of office impartially and diligently" provides:
The judicial duties of a judge take precedent over all other activities. Judicial duties include all the duties of office prescribed by law. In the performance of these duties, the following standards apply:
A. Adjudicative Responsibilities
(1) A judge shall be faithful to the law and maintain professional competence in it. A judge shall be unswayed by partisan interests, public clamor, or fear or criticism.
(2) A judge shall maintain order and decorum in judicial proceedings.
(3) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the direction and control to do so.
B. Administrative Responsibilities
(1) A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.
Judge Jefferson violated Canon 3 A(1) in that he did not maintain competence in his field. This lack of competence can be seen by the judge's reckless and bad faith handling of the contempt proceedings and imposition of excessive sentences. The judge also violated Section A(2) in that he did not maintain decorum in his courtroom. Instead, the judge used the bench as a pulpit from which to chastise attorneys and court staff. Furthermore, even if Judge Jefferson was correct in demanding that Mr. Pierre meet with him to discuss rumors that he would not honor the new court date set by the judge, the judge did not discharge this arguably administrative responsibility without bias or prejudice and did not cooperate with the prosecutor, as a court official, in the administration of the court's business as demanded by Canons 3(A)(3) and B(1). We also find that Judge *190 Jefferson was swayed by his fear of criticism in the press when he inappropriately issued orders that Mr. Pierre, Ms. Powell-Lexing and their counsel not discuss their "cases" with anyone outside the presence of the court. We further agree with the Commission that Judge Jefferson violated Canon 3(A)(3) in that he was neither patient, dignified nor courteous to Mr. Pierre or to Ms. Powell-Lexing.
Finally, Judge Jefferson also acted in contravention to La. Const. Art. V, § 25(C), which reads as follows:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony ...
The record reveals that Judge Jefferson improperly believes he is entitled to have persons brought to him by marshals and jailed if they do not conform to his subjective ideas of right and wrong. "A judgeship is a position of trust, not a fiefdom." In re Graham, 620 So.2d 1273 (Fla.1993). Judge Jefferson's repeated abuses of contempt power and judicial authority constituted persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute under La. Const. art. V, § 25(C). The incidents initiated by Judge Jefferson in open court were widely reported in the news media and ultimately caused members of the public to review both judicial system in Monroe City Court negatively and the judiciary as a whole in disrepute.

Charge II: Ban of Mr. Pierre from courtroom and dismissal of forty-one criminal cases
On May 14, 1997, in response to the adverse media attention surrounding Judge Jefferson's decision to hold Mr. Pierre in contempt of court on two separate occasions, the Mayor of Monroe convened a meeting between himself, Judge Jefferson and Mr. Pierre in an apparent attempt to resolve the conflict that had arisen between the two men. Judge Jefferson testified before the Commission that during the meeting the mayor told him that Mr. Pierre was willing to apologize for his actions. In response, Judge Jefferson said "as soon as he does that, he's free to return to my courtroom," and banned Mr. Pierre from his courtroom until an apology was forthcoming. In a letter dated June 4, 1997, from Judge Jefferson to Mr. Steve Scheckman of the Judiciary Commission, Judge Jefferson explained his actions, stating, "the result of that conference [with the mayor and Mr. Pierre] was that Mr. Pierre was banned from my courtroom because no assurances were given that his conduct would comport with proper courtroom decorum." Mr. Pierre testified that the mayor suggested to him that Judge Jefferson wanted an apology from him to clarify that the judge had engaged in no wrongdoing.
On May 15, 1997, the day after the meeting, Judge Jefferson convened criminal court, but because Mr. Pierre had been banned from Judge Jefferson's courtroom, no attorney was present to represent the City. Judge Jefferson instructed a non-lawyer employee of the prosecutor's office, who was present in the courtroom attempting to continue the scheduled matters, to represent the City in the prosecution of the cases. After at least seven of the defendants whose cases were scheduled to be heard that day protested, Judge Jefferson dismissed the charges against forty-one defendants, including those of at least seven DWI cases. Although Mr. Pierre reinstated the charges against these defendants, some of these charges were *191 challenged based on the constitutional prohibition against double jeopardy.
Judge Jefferson abused his authority when he banned Mr. Pierre from his courtroom until he received an apology for wrongs he perceived were committed against him. Although judges are empowered to require or prohibit certain conduct in their courtrooms, Judge Jefferson's act of banning Mr. Pierre from his courtroom until he received an apology constituted an extreme and unwarranted abuse of his judicial authority. While we recognize that judges must sometimes admonish and punish attorneys who disrupt their courtrooms, we simply find that in the instant case Judge Jefferson's actions went beyond the bounds of acceptable judicial behavior.
Furthermore, in an act of additional perversity, Judge Jefferson convened court on May 15, 1997, despite the fact that he knew, because of the improper ban against Mr. Pierre's presence in his courtroom, Mr. Pierre would not be present to prosecute the cases. Although there was no attorney representative from the prosecutor's office present in the courtroom, the judge called the trial docket and then proceeded to dismiss forty-one cases that included a total of 105 offenses and at least seven DWI cases. In so doing, the judge exhibited poor judgment and brought disrepute upon his judicial office. In dismissing these charges, Judge Jefferson potentially impeded further prosecution of the charges in that the defendants were given the additional defense of double jeopardy. Even though Mr. Pierre reinstated the charges the next day, Judge Jefferson's action created needless judicial expense in correcting this matter.
Additionally, Judge Jefferson's act of banning Mr. Pierre from his courtroom and dismissing forty-one criminal charges brought even more negative attention to his court. Such acts, which were conducted in open court, were widely reported in the media and caused members of the public to view the judicial system in Monroe City Court negatively. For example, one newspaper article reported that Judge Jefferson dismissed the cases as the "result of an ongoing battle between City Court Judge Larry Jefferson and City Prosecutor James Pierre." This newspaper article and others like it that referred to an ongoing feud between the two men eroded public confidence in the court system and brought the judicial office into disrepute.
For all of the above reasons, we find that Judge Jefferson abused and exceeded his authority, demonstrated poor judgment and brought his judicial office into disrepute when he banned Mr. Pierre from his courtroom and subsequently dismissed 41 criminal cases when no prosecutor was present to proceed. As such, Judge Jefferson's conduct patently violated Canons 1, 2, and 3 A(1), (2) and (3) of the Code of Judicial Conduct because the judge's actions did not preserve the integrity of the judiciary, were not in accordance with the law and did not show patience or dignity toward "lawyers and others with whom the judge deals in an official capacity." Furthermore, as illustrated above, the sum of Judge Jefferson's acts also constituted a violation of Section 25(C) of the Louisiana Constitution in that his persistent and public conduct was prejudicial to the administration of justice and brought the judicial office into disrepute.

Charge III: Unauthorized practice of law
Charge III relates to whether Judge Jefferson practiced law in violation of La. R.S. 13:1952(15)(a).[3] Prior to taking office, Judge Jefferson represented the plaintiff in Patterson v. Hutto, Inc., 89-3028. Suit was filed in the matter prior to Judge Jefferson's election and, in a letter dated October 8, 1992, almost two years after Judge Jefferson took office, he wrote a letter to opposing counsel seeking to *192 close the file. The letter stated, "[t]he procrastination ... has prolonged the time frame which I had given the judicial administrator's office in regards to finalizing all cases from private practice. This case is and has been the only one lingering for an inordinate period of time."[4] After this correspondence, Judge Jefferson arguably did not engage in any further activity on the case until June 16, 1995, when he signed as plaintiff's attorney a Motion to Dismiss the case. This motion was filed in the Fourth Judicial District Court on May 12, 1997, during the judge's second term of office.
Judge Jefferson's ongoing participation as detailed above in the Patterson case for four years after he became judge constituted the unauthorized practice of law. Judge Jefferson's unauthorized behavior in this regard did not comport with the high standards of conduct expected of a judge and called into question the integrity of the judiciary. Therefore, this behavior violated Canon 1 of the Code of Judicial Conduct. Additionally, such unauthorized practice of law violated an express statutory provision prohibiting him from practicing law during his tenure as a Monroe City Court judge, La. R.S. 13:1952(15)(a), and was a direct violation of Canon 2(A). Judge Jefferson's unauthorized practice of law similarly violated Canon 3(A)(1), which requires a judge to "be faithful to the law and maintain professional competence in it." Finally, the judge's unauthorized practice of law constituted willful misconduct relating to his official conduct as it violated a statutory prohibition. For all the above reasons, we conclude that Judge Jefferson's unauthorized handling of the Patterson case violated Canons 1, 2, and 3 A of the Code of Judicial Conduct and constituted willful misconduct relating to the judge's official duty in violation of La. Const. Art. V, § 25(C).

Charge IV: Failure to obey order issued by Louisiana Supreme Court and to cooperate with Supernumerary Judge Harrison
In early 1998, the three judges serving on the Monroe City Court began to quarrel about the way in which Judge Jefferson, as the presiding judge of the Monroe City Court, handled administrative matters. On February 27, 1998, two of the judges on the court, Judges James Garland Smith and Bernard Scott Leehy, issued an en banc order that created the position of Administrative Judge. The order also enumerated the duties and responsibilities of that office and elected Judge Smith as the administrative judge of the court. Judge Jefferson filed a lawsuit challenging the en banc order. On April 17, 1998, the Fourth Judicial District Court found Judge Smith's election valid and enjoined Judge Jefferson from interfering with Judge Smith's authority over administrative matters. In response to the conflicts arising between the three judges relative to the administrative duties of the court, this Court, on May 28, 1998, appointed a Supernumerary Judge pro tempore for the Monroe City Court. This judge, retired judge John Harrison, temporarily assumed all administrative duties of the court. The judges of the Monroe City Court, including Judge Jefferson, were expressly relieved of all administrative duties and were ordered not to assume or discharge such duties.
Against this background lies Charge IV, which stems from a criminal case involving the violation of the City of Monroe's Dog Regulatory Ordinance and culminates in Judge Jefferson's refusal to obey two orders issued by Supernumerary Judge Harrison. On August 11 and 12, 1998, two *193 dogs belonging to Ms. Dianne Hill were captured and taken to the Monroe Animal Shelter and Ms. Hill was issued citations for violating City Ordinances relating to dog nuisances and dogs running at large. Monroe v. Hill, No. 98-M-4881. On August 25, 1998, Judge Jefferson signed an order directing a writ of habeas corpus to the Director of the Monroe Animal Shelter ordering him to produce the two dogs on August 28, 1998, at 1:30 p.m., Courtroom A. The order also stated that the prosecutor (Mr. Pierre) and the Director of the Monroe Animal Shelter show cause on August 28, 1998, at 1:30 p.m., Courtroom A why an order should not issue ordering the return of the dogs to their owner. The city prosecutor filed an answer to the petition for habeas corpus on August 28, 1998. He also filed a motion to dismiss the Petition for Habeas Corpus. On the same day, Judge Jefferson ordered the city prosecutor to either file a pleading seeking authority to detain the two dogs by August 31, 1998, or they would be released. The prosecutor timely filed the motion and rule. On August 31, 1998, Judge Jefferson signed an Order setting the Rule to Show Cause for September 15, 1998, at 9:30 p.m. in Courtroom D. On September 15, 1998, Judge Jefferson denied Dianne Hill's Motion to Dismiss for No Cause of Action and Unauthorized Use of Summary Proceedings. On the same day, Ms. Hill filed her intention to apply for supervisory writs from the ruling. Judge Jefferson stayed the matter until final disposition by the Second Circuit Court of Appeal. Judge Jefferson signed this order on September 16, 1998.
Judge Harrison heard about the above-mentioned case while watching the evening news on or about August 29, 1998. He suspected judge shopping in the Hill case because it was unusual to file a writ of habeas corpus for the release of dogs and because the petition was filed and a hearing set so quickly that service of process on the numerous witnesses would have been difficult or impossible to achieve. By written memorandum dated August 31, 1998, Judge Harrison ordered Judge Jefferson to produce the pleadings in the Hill matter. Judge Jefferson refused to do so. Subsequently, on September 4, 1998, Judge Harrison ordered Judge Jefferson not to hear the Hill case,[5] which had been allotted to the September 1998 criminal docket to be heard by Judge Scott Leehy.[6] In essence, Judge Harrison had reason to believe that Judge Jefferson was trying to manipulate the random allotment scheme by hearing the case. As noted above, although Judge Jefferson received Judge Harrison's "directive or order" not to fix any rules or other proceedings in the Hill case, he presided over the case on September 15, 1998.
The record clearly shows that Judge Jefferson deliberately disobeyed both of the orders issued by Judge Harrison pursuant to his authority as administrative judge. Specifically, Judge Jefferson refused to allow Judge Harrison to review the pleading file regarding Monroe v. Hill, No. 98-M-4881 and admittedly retained the file in his chambers until "the proceeding was over." Additionally, he continued to hold proceedings in the Monroe v. Hill matter even after Judge Harrison ordered him to turn the case over to the section of court to which it had been allotted. Such conduct was unprofessional, discourteous, utterly unwarranted and a blatant violation *194 of this Court's order of May 28, 1998. Moreover, Judge Jefferson's disregard of Judge Harrison's requests and orders regarding this matter constituted willful misconduct relating to his official duty and further evidenced persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C).

IMPOSITION OF DISCIPLINE
Having determined that Judge Jefferson violated Canons 1, 2(A), 3 A(1), (2), (3), 3 B(1) of the Code of Judicial Conduct as well as the constitutional standard articulated in La. Const. art. V, § 25(C), we must now determine the proper discipline to be imposed. The judiciary commission argues that respondent's conduct warrants his removal from office. We agree that Judge Jefferson, whose conduct perniciously erodes public confidence in the integrity of the judiciary and casts a dim light on his capacity to serve as a fair and impartial judge, must be removed from office.
In imposing this most severe sanction, we are mindful that the removal of an elected member of the judiciary is an extremely serious undertaking that should be carried out with the utmost care because it disrupts the public's choice for judiciary service. In re Huckaby, 95-0041, p. 4 (La.5/22/95), 656 So.2d 292, 295. Louisiana's Constitution, however, vests in this Court the duty to preserve the integrity of the bench for the benefit of the public "by ensuring that all who don the black robe and serve as ministers of justice do not engage in public conduct which brings the judicial office into disrepute." Huckaby, 95-0041 at p. 10, 656 So.2d at 298.
As demonstrated above, Judge Jefferson engaged in improper and public conduct that demonstrates a persistent pattern of reckless, disrespectful and injudicious behavior that has inflicted significant damage upon his court and the judiciary as a whole. As we recognized in Whitaker, 463 So.2d at 1303, the most severe discipline, i.e. removal, should be reserved for judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys, and judges who, because of laziness or indifference, fail to perform their judicial duties to the best of their ability. The record reflects that Judge Jefferson consistently engaged in abusive and insensitive behavior toward the city prosecutor, the clerk of court, and his fellow judges. Additionally, the judge's dismissal of forty-one criminal cases without legal grounds, his abuse of the contempt power, his unauthorized practice of law, and his failure to cooperate with the supernumerary judge appointed by this Court constituted a clear failure to adequately perform his judicial duties.
Under La. Const. art. V, § 25(C), a judge may be removed from office for, among other things, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. Huckaby, 95-0041 at p. 7, 656 So.2d at 297. Judge Jefferson's actions, as characterized and thoroughly discussed above, clearly constituted persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute under this provision of our Constitution. Such a finding is, alone, sufficient to constitute grounds for removal. Because Judge Jefferson's conduct so persistently prejudiced the administration of justice and so often brought the judicial office into disrepute, we conclude removal is the only appropriate sanction under the circumstances.
While each individual charge against the judge, standing alone, might not warrant the extreme disciplinary measure of removal, the record, when viewed in its entirety, shows a persistent pattern of conduct that does not comport with the *195 standards required by the Code of Judicial Conduct and the Louisiana Constitution. The statements made in In re Haggerty, 257 La. 1, 241 So.2d 469 (1970), are equally applicable here:
In summary, perhaps none of the improprieties noted might be ground[s] for removal by itself. Each perhaps might be subject to minimizing explanation as an isolated instance. In cumulation, however, they amount to a substantial pattern of willful misconduct related to official duty which casts a grave doubt upon the respondent judge's ability to perform his duties impartially and in accordance with law....
Haggerty, 241 So.2d at 482.
Upon review of the entire record, we conclude the most severe discipline is warranted in this case because Judge Jefferson has repeatedly engaged in conduct that is prejudicial to the administration of justice that brings the judicial office into disrepute and erodes public confidence of the public in the judiciary. As such, removal from office is therefore the appropriate sanction in this particular case.[7] *196 As recognized by this Court more than one hundred years ago:
All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. None should serve at its altar whose conduct is at variance with his obligations. The trust to enforce this lesson of wisdom has been confided to the supreme court, and, although the task is unpleasant, it must be performed impartially and fearlessly.
State ex rel. Attorney General v. Lazarus, 39 La.Ann. 142, 161, 1 So. 361, 376 (1887). Accordingly, it is ordered, adjudged, and decreed that respondent, Judge Larry Jefferson, of the City Court of Monroe, Parish of Ouachita, State of Louisiana, be, and is hereby, removed from office; and that his office be, and is hereby, declared vacant. Respondent is cast with costs in the amount of $4,333.00 pursuant to Supreme Court Rule XXIII, § 22.
REMOVAL FROM JUDICIAL OFFICE ORDERED.
CALOGERO, C.J., dissents in part and assigns reasons.
JOHNSON, J., dissents and assigns reasons.
CALOGERO, C.J., concurring in part, dissenting in part.
I agree with the majority's findings regarding judicial misconduct, but I disagree regarding the discipline imposed. I would impose a suspension for three years, retroactive to the initial date of the interim suspension.
JOHNSON, J., Dissenting.
The Judiciary Commission of Louisiana began its investigation of Judge Larry Jefferson in the summer of 1997 based on two anonymous complaints.[1] In my opinion, allowing complainants to keep their identities anonymous can lead to abuses. See In re Thibodeaux, 99-0014 (La.7/7/99); 737 So.2d 1284. The complainant may have a political or personal vendetta, and knowing the identity of the complainant can give us valuable information to test the motive and truthfulness of the allegations.

CHARGE I
The record reflects that much of this controversy between Judge Jefferson and *197 the City Prosecutor, Mr. James Rodney Pierre, and the Clerk of Court, Ms. Carol Powell-Lexing stemmed from political and personal animosities. Judge John Harrison, who was appointed Supernumerary Judge pro tempore by this court, testified before the Judiciary Commission that upon his arrival at the Monroe City Court that there was no communication or working relationship between Judge Jefferson and others at the court. He further testified that there had been friction created between the officers of the court when Judge Jefferson was relieved of his administrative duties as senior judge by an en banc order signed by the other two judges. Then, tensions were heightened when Mrs. Powell-Lexing was given the authority to hire and discharge employees because she terminated several employees hired by Judge Jefferson. Judge Jefferson reacted by using his contempt power. This behavior demonstrated a lack of proper judicial temperament and demeanor. No judge has unbridled authority to haul officers of the court into his courtroom and find them in contempt of court without regard for the procedural rules.

CHARGE II
Judge Jefferson was scheduled to hear a docket of criminal cases, but the City Prosecutor, Mr. Pierre failed to appear. Judge Jefferson instructed an employee from the City Prosecutor's office, who was not a lawyer, to move for a continuance. At this point, a defense attorney protested that only a lawyer could proceed. Rather than recessing court for the day, Judge Jefferson dismissed the charges against 41 defendants. All of the charges dismissed that day were later reinstated by the City Prosecutor. So, it is important to note that there was no actual injury to the administration of justice. See In re William R. Brough, 98-0366 (La.4/3/98), 709 So.2d 210 (Court unwilling to impose severe sanction where no actual injury to the profession existed.) Nonetheless, Judge Jefferson's actions created an embarrassing situation for the court and could have denied victims of crime their day in court. Judge Jefferson failed to keep his personal differences in perspective. His disregard for the court process and the administration of justice warrants discipline.

CHARGE III
Charge III relates to whether Judge Jefferson practiced law in violation of La. R.S. § 13:1952(15)(a). Unlike some statutes which designate city judges as part time and allow for the practice of law, La. R.S. § 13:1952(15)(a) states: "The City Court of Monroe, domiciled in the city of Monroe, parish of Ouachita, having three city judges and a city marshal. [sic] Such city court judges may not practice law." Judge Jefferson was, thereby, prohibited from the practice of law. In this instance, Judge Jefferson represented the plaintiff in Patterson v. Hutto, Inc., 89-3028 (La. 4th JDC). The suit was filed prior to his election, but concluded during his first term as judge. Judge Jefferson maintains that he learned he could complete pending cases within a reasonable time at a new judges' conference. On October 8, 1992, Judge Jefferson wrote a letter to opposing counsel seeking to close the file. It states, "[t]he procrastination ... has prolonged the time frame which I had given the judicial administrator's office in regards to my finalizing all cases from private practice. This case is and has been the only one lingering for an inordinate period of time." After this correspondence, there is no further activity by Judge Jefferson. *198 The only document which contains his signature is the Motion to Dismiss dated June 16, 1995 but filed in 1997.
It is undisputed that Judge Jefferson signed the Motion to Dismiss in this suit. This activity constitutes the practice of law as contemplated by La. R.S. § 37:212 and therefore, is a technical violation of § 13:1952(15)(a). Nonetheless, we recognize that when one is elected to judicial office from private practice, a transition must be made. Common sense dictates that as part of this transition, where a judge is prohibited from the practice of law, a once private practitioner will have time to finalize pending cases. In the case of Patterson v. Hutto, Inc., Judge Jefferson testified that a settlement was negotiated before his election. There were documents to be exchanged, but for all intents and purposes the case was over. In every other case, Judge Jefferson either completed them within reasonable time limits or transferred them to other attorneys. In this one case, where the settlement amount had been agreed upon, he sent one letter, and filed a motion to dismiss. It is one act in one case. For this activity, I would not impose a sanction.

CHARGE IV
I agree that the evidence supports Charge IV that Judge Jefferson disregarded the orders of Judge Harrison. Judge Jefferson argues that Judge Harrison's requests extended beyond his administrative duties and usurped his judicial powers. Regardless of Judge Jefferson's beliefs, there were more appropriate avenues to challenge Judge Harrison's actions. Judge Jefferson's failure to cooperate with Judge Harrison constitutes a violation of the Louisiana Supreme Court's Order of May 28, 1998. Furthermore, his misconduct is a breach of La. Const. art. V, § 25 and should be sanctioned by this Court.

CONCLUSION
The majority recommends that Judge Jefferson be removed from judicial office. However, this court has previously stated that "[t]he most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors, and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct. In re Whitaker, 463 So.2d at 1303; see also In re Johnson, 96-1866, p. 6 (La.11/25/96); 683 So.2d 1196, 1201. Moreover, the "removal of a duly elected member of the judiciary is a serious undertaking which should only be borne with the utmost care so as not to unduly disrupt the public's choice for service in the judiciary." In re Johnson 96-1866 at p. 14, 683 So.2d at 1201 (quoting In re Huckaby, 95-0041 at p. 10; 656 So.2d at 298.)
Judge Jefferson's behavior is more akin to In re Bowers which also involved "inappropriate language and discourteous treatment of persons appearing" before the court. 98-1735, p. 10 (La.12/12/98); 721 So.2d 875, 880. Judge Gary Bowers was charged with three acts of misconduct. In Charge I, the attorney for the plaintiff filed an emergency writ application and stay order with the Second Circuit Court of Appeal, seeking relief from Judge Bowers' rulings. Judge Bowers criticized the attorney in open court and referred to his application as "eleventh-hour crap." The attorney sought a continuance for the second time, but Judge Bowers denied the continuance. Instead, he issued a bench warrant for the arrest of the plaintiff and ordered that plaintiffs name be entered into the National Crime Information Center (NCIC) for her failure to appear. Subsequently, Judge Bowers ordered that a warrant be issued for the arrest of plaintiff's husband and set his bond at $50,000. His name was also entered into the NCIC. The husband was a resident of Colorado and not a party to the lawsuit. However, Judge Bowers believed that the husband *199 was responsible for threatening phone calls received at his home. Judge Bowers referred to him on several occasions in a derisive manner, calling him a "two-bit hoodlum" and a "little pimp."
Judge Bowers was also charged with abuse of his contempt power. During one proceeding, the Judge instructed a litigant to answer a question. When she declined to do so on several occasions, he first asked the litigant if she had a hearing problem. After further protest from the litigant, he ordered her to stop speaking, held her in contempt of court, and ordered her incarcerated A writ was filed with the Court of Appeal to secure her release. In a subsequent proceeding, Judge Bowers chastised the attorney in open court for fifty minutes using occasional profanity and threatened him, stating, "if you ever do it again, I'm going to come gunning for you, do you understand?" He further commented, "I wouldn't want you to go whining up to the Court of Appeal again..."
The Commission charged a third violation wherein Judge Bowers was abusive and argumentative with another attorney appearing before the court. He warned her about arguing with the Court in an unprofessional manner stating that "maybe in New Orleans you folks do a Judge Ito deal where you argue with the court ..." In a memorandum submitted to the court by the same attorney, Judge Bowers struck through the pleadings with large question marks covering the entirety of the first and last pages, initialed and dated the document and returned it to her.
We declined to impose a suspension as recommended by the Judiciary Commission and ordered that Judge Bowers should be censured. In re Bowers should guide our decision in choosing a discipline appropriate for Judge Jefferson.
Judge Jefferson's behavior is not so egregious that it requires removal from judicial office. Compare In re Whitaker, supra (Judge was suspended for one year after smoking marijuana, associating with users and sellers of illegal drugs. The Court declined to follow Judiciary Commission's recommendation of removal.); In re Dupont, 322 So.2d 180 (1975) (Court declined to remove from judicial office or suspend judge who received stolen guns); In re Huckaby, 95-0041 (La.5/22/95); 656 So.2d 292 (Court ordered removal of judge after his consistent failure to file and pay taxes.) In re Johnson, 96-1866 (La.11/25/96), 683 So.2d 1196(Court ordered removal from judicial office where judge used his position for personal gain.); In re Haggerty, 257 La. 1, 241 So.2d 469 (1970)(Court removed judge from the bench due to his involvement in gambling and pornography). Judge Jefferson's conduct warrants a two year suspension, retroactive to his interim suspension dated October 13, 1998.
NOTES
[*] Lemmon, J., not on panel. See Rule IV, Part 2, § 3.
[1] Judge Jefferson gave reasons for his finding of contempt in a written order dated May 9, 1997. One of his written reasons was Mr. Pierre "did deliberately turn his back to the Court." Judge Jefferson filed the order in the clerk's office, but did not provide for service on Mr. Pierre. Consequently, Mr. Pierre was never served with this order.
[2] Judge Jefferson's actions were in direct violation of the injunction issued a few weeks earlier, which prohibited Judge Jefferson from exercising administrative functions.
[3] Unlike some statutes which designate city judges as part time and allow for the practice of law, La. R.S. 13:1952(15)(a) states: The City Court of Monroe, domiciled in the city of Monroe, parish of Ouachita, having three city judges and a city marshal. Such city court judges may not practice law.
[4] Judge Jefferson testified he was told that he could "complete whatever's in progress within a reasonable period of time" at a conference for new judges. He blamed the four-year delay in concluding this case on a "paperwork" delay because the Louisiana Insurance Guaranty Association was involved.
[5] Judge Harrison testified before the Commission that he issued the order for two reasons: he was concerned about "the manipulation that, I thought, was probably present" and he was "concerned with gathering the information so I could report to the Supreme Court, as I'd been instructed to do, any problems that might develop at Monroe City Court, and I felt like I needed to see everything and not just some pleadings."
[6] There are three sections of court and each judge takes one section each month on a rotating basis. Therefore, when Judge Jefferson was assigned a criminal docket one month, he would not have another criminal docket for three months. When a criminal case came into Monroe City Court, it would be assigned a future date, typically based upon how many matters were already on the docket, and the date assigned created the assignment to a particular judge.
[7] We note in passing that other courts have removed judges under similar circumstances. In Fletcher v. Commission on Judicial Performance, 19 Cal.4th 865, 81 Cal.Rptr.2d 58, 968 P.2d 958 (1998), the respondent judge was removed from office for improperly entering a judgment against a nonparty, making improper comments about an attorney appearing before him, improperly using court staff for campaign purposes, telling a court clerk she was in contempt during a meeting, engaging in several prohibited ex parte communications, failing to disqualify himself in a case, altering court records to mislead the Commission, making statements showing prejudgment of evidence, and making inappropriate reactions to disqualification attempts. The court found that although some of the incidents of misconduct seemed relatively minor, many were not and the record established a persistent pattern of misconduct that reflected a lack of judicial temperament. In concluding that removal was the proper sanction, the court stated, "Mere censure of petitioner would woefully fail to convey our utter reproval of any judge who allows malice or other improper personal motivations to infect the administration of justice."

In In re Graham, 620 So.2d 1273 (Fla. 1993), the respondent judge was removed after being charged with the following violations:
1. Repeatedly using his position to make allegations of official misconduct and improper criticisms against fellow judges, elected officials and their assistants and others, without reasonable factual basis or due regard for their personal and professional reputations.
2. Exceeding and abusing the power of his office by imposing improper sentences and improper use of contempt power.
3. Acting in an undignified and discourteous manner toward litigants, attorneys, and others appearing in his court.
4. Acting in a mater which impugned the public perception of the integrity and impartiality of the judiciary.
5. Closing and attempting to close public proceedings.
In finding these violations were established and removal from office was the appropriate discipline, the court stated, "A judgeship is a position of trust, not a fiefdom. Litigants and attorneys should not be made to feel that the disparity of power between themselves and the judge jeopardizes their right to justice." Respondent was thus ordered removed from office.
The judge in In re Crowell, 379 So.2d 107 (Fla.1979), was removed from office for abuse of power. The judge's objectionable behavior included the holding in contempt the father of a juvenile who quested the judge's order confining the juvenile to a shelter in retaliation for his attorney's refusal to stipulate to the identification of certain physical evidence, the holding in contempt of an attorney for allegedly refusing to answer the judge's questions (the record revealed, however, that the attorney had attempted to answer the judge's questions), the chastisement of an officer of the sheriff's department in the courtroom because the officer refused to cooperate with the judge's secretary in an administrative matter and the threat of holding in contempt a delivery truck driver whose truck was blocking the judge's access to his reserved parking space. The court concluded that because the judge's conduct demonstrated a present unfitness to hold office, the constitutional standard at issue, the judge should be removed from office.
In another removal case, In re Seitz, 441 Mich. 590, 495 N.W.2d 559 (Mich.1993), hostility between the respondent judge and the other judge on the bench was so great that the Michigan Supreme Court had to appoint a court of appeals judge to act as chief judge and special administrator of respondent's court. During this time, the respondent judge developed a "bizarre relationship" with sexual overtones with his secretary/court reporter, issued orders contrary to those issued by the administrative judge and, when those orders were not followed, held persons in contempt of court, accused his colleague of obstruction of justice and requested that the prosecutor bring criminal charges against him and treated employees of the court with disrespect and refused to work with certain individuals. The court found that the judge's actions conjured up "specific impressions of belligerence, vindictiveness, hostility, bitterness, disrespectfulness, and considerable perversity of will and motive." The court concluded that because respondent's behavior was sufficiently serious and pervasive so that his continuation in office would be clearly prejudicial to the administration of justice. Therefore, it was ordered that he be removed from office.
Finally, in In re Duckman, 92 N.Y.2d 141, 677 N.Y.S.2d 248, 699 N.E.2d 872 (1998), the respondent judge was removed for wrongfully disposing of 16 criminal cases and inappropriate behavior in his dealing with persons appearing before him. The court noted that the judge's improper conduct was not isolated and found that the judge lacked the insight and self-control to make fundamental changes in his attitude or judicial temperament. Based on these observations, the court ordered the judge removed from office.
[1] The Commission has revised JCL Rule III, which became effective November 19, 1999. The Rule now reads:

The Commission, however, may consider alleged misconduct or disability of any judge from whatever source, including anonymous complaints and news reports, and may do so on its own motion. An anonymous complaint may not be reviewed or investigated unless it states facts, not mere conclusions, that can be independently verified.