On Recommendation For Discipline From The Judiciary Commission of Louisiana
11 JOHNSON, Justice.
This matter comes before the Court on the recommendation of the Judiciary Commission of Louisiana (“Commission”), a constitutional body charged with initiating disciplinary action against a judge, that Judge Pamela Taylor Johnson of the East Baton Rouge Parish Juvenile Court, State of Louisiana, be suspended for sixty (60) days, without pay, and be ordered to reimburse and pay to the Commission the costs incurred in the investigation and prosecution of this case. The Commission conducted an investigatory hearing, made findings of fact and law, and determined that Judge Johnson violated multiple Canons of the Code of Judicial Conduct; engaged in willful misconduct relating to her official duty and failed to perform her duty; engaged in persistent and public conduct prejudicial to the administration of justice that brings the judiciary into disrepute, in violation of La. Const, art. V, § 25(C).
On January 29, 2001, the Commission formally charged Judge Johnson with failing “to render, issue and sign judgments in a timely manner” in thirty-four (34) nonsupport cases. That Charge, Charge 0150, was later supplemented, accusing Judge Johnson with “failure to render, issue and sign judgments” timely in thirty-seven (37) cases. However, the Commission ultimately concluded that Judge Johnson 1 ^failed to sign thirty-six (36) judgments in a timely manner. According to the Commission, Judge Johnson’s conduct violated Canons 1, 2 A, 3 A(7), and 3 B(l) of the Code of Judicial Conduct, as well as La. Const, art. V, § 25(C).
. Subsequently, on September 25, 2003, in Charge 0206, the Commission formally charged Judge Johnson with failure “to uphold high standards, fail[ure] to follow the law, and fail[ure] to cooperate with other judicial officers and courts by failing to follow the orders of Supernumerary Judge Pro Tempore Salvadore T. Mulé and the Louisiana Supreme Court, in violation of Canons 1, 2 A, 3 A(3), 3 B(l), and 3 B(2) of the Code of Judicial Conduct, as well as La. Const, art. V, § 25(C).
*411 On that same date, Judge Johnson was formally charged, in Charge 0207, with violating 1, 2 A, 3 A(2), and 3 33(1), and La. Const, art. V, § 25(C) by “failing] to uphold high standards of conduct to promote public confidence in the integrity and impartiality of the judiciary and to cooperate with other judges and court officials in the administration of court business, by interrupting hearings conducted by Judge Ann Murry Keller.”
For the reasons that follow, we find that Charge 0150, relating to failure to render judgments in certain non-support cases in a timely manner, and Charge 0206, relating to failure to cooperate with Judge Mulé, were not proven by clear and convincing evidence. Accordingly, we dismiss those charges against Judge Johnson.
Regarding Charge 0207, failure to conduct hearings as requested by Judge Mulé, we find that Judge Johnson violated Canons 1 and 3 B(l) of the Code of Judicial Conduct, as well as La. Const, art. V, § 25(C). Accordingly, we find that Judge Johnson’s misconduct warrants public censure.
We reject the Commission’s recommendation that Judge Johnson be ordered to reimburse the Commission $7,288.32, the costs incurred in connection with the | ^investigation of the proven charges, since that amount includes numerous charges that were investigated and prosecuted but not proven by clear and convincing evidence. Accordingly, we remand this matter to the Judiciary Commission for purposes of recalculating the costs to reflect only those items which relate to proven charges, including transcript costs.
FACTS AND PROCEDURAL HISTORY
Respondent, Judge Pamela Taylor Johnson, assumed her office as a judge of Division B of the East Baton Rouge Parish Juvenile Court, State of Louisiana on January 1, 1995, and she has served continuously since that time.[1] The Commission initiated an investigation of Judge Johnson after receiving an anonymous complaint dated July 31, 1999.[2] In the complaint, it was alleged, inter alia, that Judge Johnson failed to render non-support judgments in a timely manner. After an initial investigation, the Commission determined that formal charges against Judge Johnson were warranted, and on January 29, 2001, the Commission formally charged Judge Johnson with failure to “render, issue and sign judgments in a timely manner” in thirty-six (36) cases and failure to report to the Judicial Administrator that she had taken these cases under advisement.
On the basis of newspaper reports regarding the difficulties experienced at the East Baton Rouge Juvenile Drug Court, over which Judge Johnson had exercised administrative authority, the Commission extended its investigation of Judge Johnson. On September 25, 2003, the Commission formally charged Judge Johnson with failing to comply with this Court’s order, pursuant to which she was | ¿relieved of all administrative duties at East Baton Rouge Parish Juvenile Court, in violation of Canons 1, 2, 3 A(3), 3 B(l), and 3 B(2) of the Code of Judicial Conduct, and/or La. Const, art. V, § 25(C).
A hearing was held before the Commission, and on December 6, 2004, the Commission rendered its Findings of Fact and
*412 Conclusion of Law pursuant to those proceedings. Regarding Charge 0150, the Commission concluded that Judge Johnson failed to render judgments in a timely manner in violation of Canon 3 A(7), Canon 3 B(l), Canon 1, and Canon 2- A of the Code of Judicial Conduct;[3] and/or engaged in | ¿willful and persistent failure to perform her duty; and/or engaged in willful misconduct relating to her official duty; and/or engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, in violation of La. Const, art. V, § 25(C).[4] The Commission concluded that Judge Johnson’s delay in signing and rendering non-support judgments violated Canons 1, 2 A, 3 A(7), and 3 B(l) of the Code of Judicial Conduct and La. Const, art. V, § 25.
Regarding Charge 0206, the Commission concluded that Judge Johnson’s disregard for Judge Mule’s authority and failure to cooperate with him as he exercised his administrative duties demonstrated a violation of Canons 1,[5] 2 A,[6] 3 A(3),[7] and | fi3 B(l)[8] of the Code of Judicial Conduct.[9]
*413 In reference to Charge 0207, the Commission concluded that Judge Johnson’s refusal to cooperate in conducting disposi-tional hearings constituted a violation of Canons 1, 2 A, 3 A(7), and 3 B(l), as well as willful misconduct relating to her official duty and a failure to perform her duty, in each case in violation of La. Const, art. Y, § 25(C).
Based on its findings, the Commission recommended that Judge Johnson be suspended from judicial office for a period of sixty (60) days and that “she should be required to stay away from the East Baton Rouge Parish Juvenile Court during the suspension time.” The Commission further recommended that Judge Johnson be ordered “to reimburse and pay to the Commission the amount of $7288.32 in hard costs.”
DISCUSSION

Jurisdiction, Standard of Review, and Burden of Proof

This Court is vested with exclusive original jurisdiction in judicial disciplinary | ./proceedings. Pursuant to La. Const, art. V, § 25(C), on the Commission’s recommendation, this Court “may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.” Therefore, this Court has the power to make original determinations of fact based upon the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. In Re Quirk, 97-1143 (La.12/12/97), 705 So.2d 172, 176.
Pursuant to its supervisory authority over all lower courts, this Court adopted the Code of Judicial Conduct, effective January 1, 1976, and amended it on July 8, 1996. The Code of Judicial Conduct is binding on all judges and violations of its Canons may serve as the basis for the disciplinary action provided for by La. Const. art. V, § 25(C). In re Jefferson, 99-1313 (La.1/19/00), 753 So.2d 181, 184; In re Bowers, 98-1735 (La.12/1/98), 721 So.2d 875, 879; In re Quirk, supra; In re Marullo, 96-2222, (La.4/8/97), 692 So.2d 1019, 1021; In re Decuir, 95-0056 (La.5/22/95), 654 So.2d 687, 692. However, it is unnecessary that there be a violation of a Canon of the Code of Judicial Conduct for there to be constitutional misconduct under Article V, Section 25(C). “If there is misconduct as defined in the Constitution, it is irrelevant that no ... ethical canon has specifically been violated.” In Re Lemoine, 96-2116 (La.4/4/97)(on rehearing), 692 So.2d 358, 359.
Before this court can impose discipline, the charge or charges against a judge must be proven by clear and convincing evidence. In re Jefferson, 753 So.2d at 184; In re Bowers, 721 So.2d at 880; In re Johnson, 96-1866 (La.11/25/96), 683 So.2d |81196,1199; In re Huckaby, 95-0041 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a mere preponderance of the evidence, but less than beyond a reasonable doubt. In re Jefferson, 753 So.2d at 184-85; In re Bowers, 721 *414 So.2d at 880; In re Quirk, 705 So.2d at 176; In re Huckaby, 656 So.2d at 296.
With those percepts in mind, we turn to the case before use. For the sake of clarity, we will discuss the charges individually.

Charge 0150

In Charge 0150, the Commission charged Judge Johnson with failure to render judgments in thirty-six non-support cases in a timely manner. By way of background, the non-support cases are instituted by the District Attorney’s office on behalf of a parent seeking to obtain child support from a non-custodial parent. During the pertinent time period, non-support cases in East Baton Rouge Juvenile Court were heard by a hearing officer, pursuant to LSA-Ch.C. art. 423.[10]
|9In this case, following a non-support hearing, the East Baton Rouge Parish Juvenile Court hearing officer would make factual findings and prepare a recommendation and present it to the judges for signature. At the time in question, Patrick Bella was the hearing officer for East Baton Rouge Parish Juvenile Court.
| inAccording to Mr. Bella, once a hearing was concluded and a recommendation for child support was made by him, he kept the record in his office until the time delays for an objection to the recommendation lapsed. Thereafter, he certified that no objection has been made, and forwarded the file to the clerk of court’s office to be forwarded to the district attorney’s office for the preparation of a “hard” judgment.[11] The district attorney’s office *415 would then prepare the hard judgment, based on his recommendation, and return it to the clerk of the juvenile court for filing. Once the judgment was received by the clerk of court’s office, a clerk of court employee would date and time stamp the proposed judgment. Thereafter, the proposed judgment was routed to the appropriate judge for review and signature.
On August 14, 1998, a Judges’ Meeting was held, with Judge Johnson, Judge Kathleen Richey (East Baton Rouge Juvenile Court Division A), Mr. Bella, Donna Carter, Judicial Administrator of the Juvenile Court, and Darlene Kaufman, Deputy Judicial Administrator, in attendance. During the meeting, Mr. Bella stated that the court was “out of compliance on judgments being signed.” The discussion centered around complaints from the district attorney’s office regarding the length of time it took to get non-support judgments out of the court. Mr. Bella stated that during recent times, he had witnessed “some mighty big screw-ups” on the part of the district attorney’s office. Apparently, many of the proposed judgments contained errors and had to be sent back to the district attorney’s office for correction. Mr. Bella attributed the delays in getting the final judgments signed to “numerous breakdowns in paper flow, duplication of efforts, and various errors made among all of the agencies |1 involved.” At some point during the meeting, Mr. Bella suggested that he start reviewing the judgments. Both judges agreed, and the process of having Mr. Bella review the proposed judgments commenced.
In reviewing proposed judgments, Mr. Bella testified that he would check the proposed judgment for errors. If errors were found, he would send the document back to the district attorney’s office with a note to make corrections. After the district attorney’s office submitted the corrected judgment, the clerk’s office would place a date and time stamp on it. Once the review was completed, Mr. Bella would place his initials under the judge’s signature line to indicate that it had been reviewed by him.
According to Mr. Bella’s testimony, at some point after the August 1998 meeting, he presented some proposed judgments to Judge Johnson for her signature, and Judge Johnson gave them to her law clerk for review. When Mr. Bella questioned Judge Johnson’s actions, she replied that she was having her law clerk review the proposed judgments. At that point, Mr. Bella expressed that he would no longer review proposed judgments in Judge Johnson’s section of juvenile court.
Michael Smith, Judge Johnson’s law clerk at the relevant time, testified that Judge Johnson did not follow the procedure of having Mr. Bella check the proposed judgments because it was Mr. Bella who made some of the errors that needed to be reviewed. According to Mr. Smith, he checked the proposed judgments to ensure that they conformed with both the hearing officer’s recommendation and the law. He stated that the proposed child support judgments contained “lots of errors,” including errors in calculations and errors in the names of the parties involved, as well as dates. Mr. Smith also testified that some of the proposed judgments submitted contained ex parte orders setting arrearages,[12] some did not conform to the *416 hearing officer’s | ^recommendation, and others failed to include the 5% administrative fee. He also testified there were also some errors in which the recommendations would not include the language, “income assignment order,” but the proposed judgment included that language. Mr. Smith testified that when an error was detected on a proposed judgment, he would write a note listing the reason(s) that it was deficient and send it back to the district attorney’s office for corrections. The district attorney’s office would then prepare a new judgment and send it back to the Juvenile Court.
Mr. Smith testified that on one occasion, Mr. Bella came to him and told him that there was a stack of proposed judgments in the clerk of court’s office which needed to be reviewed because he wanted to ask Ms. Marcia Harris Burden,[13] who was sitting ad hoc to Judge Johnson, to sign the judgments. Mr. Bella testified that he presented 160 judgments to Ms. Burden for her signature.
Ms. Burden testified that she sat ad hoc for Judge Johnson July 19-23, 1999. She was approached by Mr. Bella, who asked her if she would sign some non-support judgments. Ms. Burden stated that she signed a large number of judgments during that week but could not recall the specific number. She stated that the judgments were not in Judge Johnson’s office. Rather, they were brought to the office by Mr. Bella and Mr. Smith throughout the week.[14] Ms. Burden further testified that on [1saverage, it took 10-15 minutes to review each proposed judgment, some of which contained typographical errors. Some of the judgments had the wrong year typed on them, for example “1998” was typed instead of “1999.” In those cases, she would strike through the incorrect number, and write the correct number. She stated that one of the judgments contained an error in its caption, and she did not sign it. Instead, she brought the matter to Judge Johnson’s attention and sent it back for correction.
Ms. Burden also testified that she sat ad hoc for Judge Johnson again in April, *417 iu2000. On that occasion, she observed “a large number of files stacked in a chair” in Judge Johnson’s office.
Donna Carter, the Judicial Administrator of the East Baton Rouge Parish Juvenile Court, has been the Judicial Administrator since 1992. She testified that she did not implement a tracking system to determine when proposed judgments were filed in the clerk’s office and when the judgments were actually signed. She admitted that Judge Johnson had been a proponent of devising a method to ensure that judgments were executed in a timely fashion.
Darlene Kaufman, the court’s Deputy Judicial Administrator Assistance Operator, testified that the proposed judgments from the district attorney’s office are stamped with a date and time stamp when they are received by the juvenile court’s clerk of court’s office. She stated that Judge Richey’s proposed judgments are routed immediately to her division. However, there is a delay in routing proposed judgments to Judge Johnson because records have to be ordered. She stated that it took anywhere from two to three days to a month or longer, depending upon whether the downtown staff had difficulty locating the records. Ms. Kaufman also testified that there was no method of tracking when a proposed judgment was actually submitted to Judge Johnson. Also, there was no method of ascertaining when a requested record was received by the requesting judge.
Judge Johnson testified that it does not take long for her to sign the judgments once they came into her possession. She testified that she instituted the procedure of having her law clerk check the proposed judgments because she is ultimately responsible for the judgments. Judge Johnson stated that Mr. Bella should check his own recommendations only for the sake of double checking his own work. However, the proposed judgments need to be checked by someone other than Mr. Bella to [1fiensure that his recommendation is proper. According to Judge Johnson, having a hearing officer does not mean that she has abdicated her responsibilities as a judge. She stated that once a hearing officer makes a recommendation, she retains the right to review the recommendation and make any necessary changes.[15]
LSA-R.S. 13:4207 provides, in pertinent part:
The district judges and the judges of the city courts, shall render judgments in all cases taken under advisement by them, within thirty days from the time the cases are submitted for their decision ....
Following the hearing, the Commission found that Judge Johnson was required to expeditiously prepare and issue a judgment in each non-support case before her. If the solution of using the hearing officer to review the judgments was not sufficient for Judge Johnson, or if she felt it was important to conduct an in-depth review of each case file before signing a proposed judgment, she was ethically obligated to cause this process to occur rapidly so that the judgments could issue expeditiously. This she did not do, and her actions created a clear potential for harm.
Supreme Court General Administrative Rules Part G, § 2, which pertains to cases taken under advisement, states, “A case or *418 other matter shall be considered as fully submitted for decision to the trial judge, and should be decided, immediately upon the conclusion of trial or hearing, and judgment signed expeditiously thereafter.” [16] The Commission found that the “exceptional” circumstances identified |1fiin the rule were not apparent in the cases specified in Charge 0150. In fact, because of the expedited nature of non-support cases in juvenile matters, and the laws and rules that apply, the Commission concluded that the time periods applicable to Judge Johnson were even shorter than would be allowed under this court’s rule. Even giving Judge Johnson the benefit of the doubt that she had the more “generous” time periods set forth in the rule, which the Commission noted does not appear to be the case, Judge Johnson did not even meet those deadlines when it came to the cases set forth in Charge 0150.
The Commission found that Judge Johnson did not report the specified cases as under advisement. The Commission rejected Judge Johnson’s defense that she signed judgments soon after they were presented to her, finding the eases in question were submitted at the time the hearing officer made his recommendation and the time period for appeal had lapsed. The Commission explicitly noted that Judge Johnson created a system that delayed the judgments from being presented to her. Such conduct is in violation of Supreme Court General Administrative Rules Part G, § 2, as well as Canons 1 and 2 A of the Code of Judicial Conduct and La. Const, art. V, § 25(C).
117Pecisional delays thus have been considered by the courts on a case-by-case basis. In deciding whether to and how to sanction decisional delay, the courts have considered several factors, including (1) the amount of delay from the date the case was ripe for decision; (2) the complexity of the case; (3) the administrative and judicial workload of the judge; (4) the number of special assignments given to the judge; (5) the amount of vacation time taken; and (6) other complaints involving delayed decisions made against the judge. In Re Tuck, 96-1444 (La.11/25/96), 683 So.2d 1214, citing, Matter of King, 184 W.Va. 177, 399 S.E.2d 888, 892 (1990).
Sanctions have been imposed in cases involving (1) a substantial number of delayed decisions; (2) a small number of delayed decisions involving particularly long delays; and (3) proof of vindictive or other malicious motive behind an instance of delay. In re Tuck, supra; In Re Sommerville, 178 W.Va. 694, 364 S.E.2d 20, 23 (1987). When there are only one or two cases of delay, the courts generally have declined to sanction a judge, absent some other type of misconduct or aggravating circumstances. Jeffrey‘M. Shaman et al., Judicial Conduct and Ethics §' 6.05 (2d ed.1995). Typically, such a situation would be handled informally with a warning kept in the judge’s file in case of a similar future violation. In the cases where the judge charged with delay in one or two *419 cases has been disciplined, there generally were aggravating circumstances that themselves bordered on misconduct, rendering the failure to adhere to the prompt disposition requirement much more egregious. Id. Examples include intentional delay to retaliate against attorneys that brought a disciplinary complaint against the judge or to benefit a judge’s family member. Id.
In In Re Tuck, supra, this Court held that a minimum sanction of censure was warranted by a six-year delay in deciding a case, in light of the judge’s failure to report that case and another case to the Judicial Administrator as being under | ^advisement. This Court noted that the delay in the case which the judge inadvertently neglected did not amount to sanc-tionable misconduct. However, in the other case, while Judge Tuck did not have a dishonest motive, he did allow the lawyers to abuse the decision-making process by allowing them numerous extensions in which to file briefs. This Court held that “decisional delay is a prevalent problem in the litigation arena, and the judge, especially at the trial court level, must accept the responsibility of requiring lawyers to meet briefing schedules by refusing unjustified extensions or by simply deciding the ease. In re Tuck, 683 So.2d at 1219. This Court further noted that the delays alone might not constitute sanctionable misconduct, his failure to report accurately that the cases were under advisement increased the violation to the level of sanc-tionable conduct. Id.
In In Re Emanuel, 98-3142 (La.4/13/99), 755 So.2d 862, Judge Emanuel was charged with failure to timely render and sign judgments in two cases and failure to report a case as under advisement for more than one year, inter alia[17] Each of the cases involved delays of approximately one year. This Court rejected the judge’s argument that the case was not under submission until June of 1996, when he sent the attorneys a letter stating that the case was now considered submitted, stating:
Supreme Court Rule G, General Administrative Rules, § 2 requires that a matter is considered fully submitted on the day following the day of the last timely filing of a brief and sets limits on the allowable length of an extension of time to file a brief. After extensions were granted, the last brief was filed on March 22, 1996. The matter was fully submitted on that date, or, arguably, at the latest, in April when Judge Emanuel discovered that the parties would be filing no more briefs. Thus, the matter should have absolutely been reported in the June and July of 1996 reports as required by Supreme Court Rule G, General Administrative Rules, § 2(b). Judge Emanuel did not |1flreport the matter until August of 1996.
755 So.2d at 872. This Court concluded that public censure was warranted.
In In Re Judge Wimbish, 98-2882 (La.4/13/99), 733 So.2d 1183, the majority of this Court held that the minimum sanction of public censure was warranted for the failure to render timely decisions in fifty-six cases, failure to report seven cases under advisement, and failure to timely report the status of 34 cases under advisement.
The present case involves thirty-six delayed decisions in non-support cases. Of the thirty-six cases, twenty-five had delays between three and six months, eight had delays between eight months and one year, and three had delays of two years or more. *420 However, this case is distinguishable from the above cited cases, in which the cases at issue were tried and/or heard by the judges and were taken under advisement by those judges immediately thereafter.
In this case, all of matters at issue were heard by Mr. Bella, the hearing officer. Following the hearings, Mr. Bella forwarded his recommendation to the district attorney’s office, which was responsible for preparing the proposed judgments comporting with Mr. Bella’s recommendation. Once the proposed judgment was received by the Juvenile Court’s clerk’s office from the district attorney’s office, it was date stamped and forwarded to the appropriate judge for signature. We are unable to determine from this record when thirty-six proposed judgments were actually presented to Judge Johnson for her signature. It is unknown when the proposed judgments in which errors were discovered by Judge Johnson or her staff were sent back to the district attorney’s office for correction. It is also unknown when the proposed judgments were sent back to Juvenile Court and forwarded to Judge Johnson for signature. In fact, it is significant that during the hearing in this matter, the parties stipulated that if each of the thirty-six records at issue was [ 2f)searched, there is nothing in any of the record to indicate when Judge Johnson’s office received the proposed judgments for her signature or how long the records were in her office prior to her signing them.[18]
During the August 14, 1998 meeting, Judge Richey complained about the length of time it took for a proposed judgment that was sent back to the district attorney’s office for correction to be returned to the appropriate judge for signing.[19] During that same meeting, Judge Johnson proposed instituting a “tracking system” to track a proposed judgment from the time the hearing officer made a recommendation until the date the judgment was signed.[20] Donna Carter testified that Judge Johnson was a proponent of a method to determine and ensure that judgments would be executed in a timely fashion.
After a thorough review of this record, there is no clear and convincing evidence as to when the thirty-six judgments at issue were submitted to Judge Johnson, or that Judge Johnson failed to sign the thirty-six judgments in a timely ^manner. As indicated above, no one could testify as to when any of the proposed judgments reached Judge Johnson. Absent clear and convincing proof that Judge Johnson failed to sign judgments in a timely fashion and failed to report them to the Judicial Administrator as “cases under advisement,” *421 after they were submitted to her for her consideration, we decline to impose discipline upon Judge Johnson relating to Charge 0150.[21]

Charge 0206

Charge 0206 concerns Judge Johnson’s alleged failure to follow the orders of this Court and Supernumerary Judge Pro Tempore Salvadore T. Mulé. On February 13, 2001, this Court appointed Judge Salvadore T. Mulé[22] as Supernumerary Judge pro tempore of Juvenile Court for the Parish of East Baton Rouge because of unresolved friction between Judge Johnson and Judge Richey that affected the administration of the court. By this appointment, Judge Mulé temporarily assumed “full and complete authority to discharge any and all administrative functions of Juvenile Court for the Parish of East Baton Rouge ...,” and Judge Johnson and Judge Richey were relieved of all administrative duties and responsibilities relating to their offices.[23]
| P!>At this point, we feel it is necessary to provide some background to aide in understanding the circumstances surrounding the friction at the East Baton Rouge Parish Juvenile Court, which necessitated our appointment of Judge Mulé.[24] In 1996, Judge Johnson prepared (or caused to be prepared) an application for a Juvenile Court Planning Grant, which was submitted to the United States Department of Justice, Office of Justice Programs’ Drug Courts Program. On the grant application, Judge Richey, among others, was listed as a “stakeholder.” Judge Richey objected to the inclusion of her name on the application, asserting that her name was included without her knowledge or consent. The grant application was subsequently approved by the Justice Department, and funding was obtained and utilized to establish the East Baton Rouge Parish Drug Court, as well as the Straight and Narrow Drug Treatment Center(“S.A.N.D.”), a facility run by the East Baton Rouge Parish Drug Court. Soon thereafter, rumors of a “feud” between Judge Johnson and Judge Richey emerged.
During his testimony in the current proceedings, Judge Mulé testified as follows:
[Ajfter talking to both of the judges, I just felt that the basic problem was one of power, a power struggle as to who was going to be the chief judge of the court. And two words, power and race I found were the problems that existed there. -
[[Image here]]
[A]s I saw the basic problem, again, was one of power, who was going to be run *422 ning the court. Was it going to be Judge Richey or was it going to be Judge Johnson? It seemed that that was the basic reason why they couldn’t 123get along with each other[25]
After Judge Mule’s appointment, apparently, confusion ensued regarding the scope of Judge Mule’s duties as administrative judge and his role pertaining to the drug court and S.A.N.D. Judge Johnson continued to meet and correspond with Peter John, Program Administrator S.A.N.D., as well as conduct other business concerning the drug court and treatment program.[26]
It is apparent from the record that at the time Judge Mulé was appointed as Supernumerary Judge pro tempore, an audit of the drug court and S.A.N.D. was |84underway. On March 16, 2001, Judge Mulé sent a memorandum to Mr. John, requesting certain documents necessary for the auditor to complete the audit. In a separate memorandum, Judge Mulé informed Mr. John of a debt owed by S.A.N.D. to the Juvenile Court and requested that checks be forwarded to the court for payment.
On March 19, 2001, Judge Johnson drafted a memorandum to Mr. John, stating that she had received a copy of Judge Mulé’s memorandum regarding the debt. Judge Johnson questioned the nature and the validity of the debt, and requested a response from Mr. John with a deadline imposed.[27] Judge Johnson further advised Mr. John that she was scheduling mandatory training for all S.A.N.D. professional staff.
Apparently, there was some persistent confusion regarding the amount and source of the debt owed by S.A.N.D. to the court. In a memorandum from Judge Mulé to Judge Johnson, dated April 18, 2001, he provided Judge Johnson with copies of cancelled checks, invoices, payroll reimbursement requests, and various other source documents evidencing the debt owed to the court by S.A.N.D. On April 19, 2001, Judge Johnson responded, explaining that she would review the documents he had provided her with and “check it against previous reimbursements to both *423 the general and judicial- expense fund,” Judge Johnson stated that after a determination was made regarding the amount to be reimbursed, payment would be forthcoming. 12BJudge Johnson ended the memorandum with, “Again thank you, for the source information, and let’s continue to work together.”
On May 15, 2001, the auditors wrote Judge Mulé, requesting more documents concerning S.A.N.D. The following day, Judge Mulé wrote Mr. John, attaching a copy of the request from the auditor, and stated, “It is important that this be complied with immediately, as this audit must be furnished to the City as soon as possible.” Judge Mulé forwarded a copy of the correspondence to Judge Johnson.
On May 24, 2001, Judge Johnson responded to Judge Mulé, explaining that certain items requested by the auditor “involved [her] activities directly.” She stated that, after conferring with Ms. Carter, its was discovered that some of the items had previously been provided to the auditor, and the remaining items had been forwarded to Mr. John. She further stated:
I asked Mr. John to consult with Ms. Carter to avoid duplication of their efforts. I also asked him to speak with the auditor directly regarding questions he might have and or to provide clarification to the auditor regarding information he provided. I believe this is an appropriate course of action designed to avoid any further delays in getting the audit completed.
On May 24, 2001, Mr. John provided some of the remaining documentation requested by the auditor and suggested that some of the items were in the possession of Judge Johnson.
The snafu involving East Baton Rouge Juvenile Court, Drug Court, and S.A.N.D. continued. Periodically, Judge Mulé kept this Court and Dr. Hugh Collins, Judicial Administrator, abreast of his progress at the Juvenile Court. There was apparently some turmoil regarding Judge Mule’s role as Supernumerary Judge and whether his appointment included supervision of the Drug Court program.
On July 16, 2001, acting on behalf of this Court, Justice Catherine Kimball, | ¡>fisent a letter addressed to Judges Johnson and Richey, Retired Judge Mulé, and Mr. John, “to clarify any confusion which may exist concerning the nature and scope of Retired Judge Salvador Mule’s' duties at Juvenile Court for the Parish of the Parish of East Baton Rouge.” After reiterating the language set forth in this Court’s Order appointing Judge Mulé, the letter stated, in relevant part:
It is abundantly clear to me that the Court’s Order encompasses all Juvenile Court programs, including the Drug Court and the Treatment Center. As such, Judge Mulé has sole and exclusive decision-making authority with regard to administration of the Drug Court and the Treatment Center. During the term of Retired Judge Mulé’s assignment, neither Judge Johnson nor Judge Rich-ey is to be considered the supervisor of Mr. John, nor are Judges Johnson or Richey to be involved in any way in the administration of the Drug Court or the Treatment Center.
Mr. John is to report to Judge Mulé, who is to be considered Mr. John’s supervisor during the period of Judge ■Mulé’s assignment. Furthermore, Mr. John is to communicate with Judge Mulé, and not with Judges Johnson or Richey, concerning his duties and responsibilities, or concerning any other issues involving management of the Drug Court and the Treatment Center.
* * *
On July 27, 2001, Judge Johnson wrote Judge Mulé, informing him that she had *424 spoken to one of the auditors. On July, 30, 2001, Donna T. Carter, the Judicial Administrator of the East Baton Rouge Parish Juvenile Court, forwarded an interoffice memorandum to Judge Mulé, informing him that on July 27, 2001, Judge Johnson had telephoned Ms. Carter to inform her that one of the employees of the accounting firm had been “ ‘relieved of his duties’ of providing accounting services to the Drug Court Treatment Program” and that she (Judge Johnson) was meeting with another member of the same accounting firm.
On August 15, 2001, Judge Mulé wrote to Dr. Hugh Collins, Judicial | ^Administrator of the Louisiana Supreme Court, complaining of the following: (1) Judge Johnson failed to attend an en banc judges meeting held on June 21, 2001;[28] (2) Judge Johnson delayed producing her files pertaining to the Drug Court for two weeks; (3) Judge Johnson, Peter John, and Ferlenzo Holmes, S.A.N.D.’s program director, met with a member of the accounting firm to discuss the audit of the center’s records without alerting Judge Mulé that the meeting was taking place; (4) Judge Johnson rejected Judge Mulé’s suggestion that they meet to discuss the audit at 10:00 a.m., stating that she preferred to meet at 1:00 p.m.; (5) Judge Johnson continued to have contact with S.A.N.D. personnel by meeting with them. Judge Mulé further recommended that “the Treatment Center be eliminated,” opining that “[t]he court should not be involved in a treatment program.” Judge Mulé also recommended the establishment of a new drug court, following the guidelines established by this Court. He further recommended that “the present administrator and program director not be considered for any position with a new drug court.”
On September 6, 2001, Judge Mulé again wrote Dr. Collins, complaining that Judge Johnson continued to refer to herself as “Chief Judge” and referred to him as hs“the Administrative Judge.”[29] The letter also summarized Judge Mulé’s difficulties obtaining information from Mr. John and Judge Johnson’s correspondence with Judge Mulé and Mr. John. Judge Mulé further informed Dr. Collins that Judge Johnson, accompanied by Mr. John and Ferlenzo Holmes, S.A.N.D.’s Program director, “met with Mr. Michael Johnston of Johnston and Hayden Accounting Firm to discuss the audit of the Drug Court.” According to Judge Mulé, he was not aware of the meeting and was not consulted.
Dr. Collins forwarded the September 6, 2001 letter to the Commission, and on September 24, 2001, the Office of Special Counsel informed Judge Johnson that the *425 letter “raises the following issue which could implicate Canon 3 B of the Code of Judicial Conduct:
1. whether you have failed to comply with the orders of the Louisiana Supreme Court by failing and/or refusing to either cooperate with, or follow the orders of, Administrative Judge Salva-dore Mulé.
During the hearing related to Charge 0206, much of Judge Mule’s testimony centered around Mr. John’s refusal to cooperate with him. Judge Mulé complained that Mr. John “never directly complied with any of the requests that I made. The only time he complied was if Judge Johnson told him to do so.” Judge Mulé also stated that Mr. John “showed me no respect from the very first day that I got there ...,” and Mr. John sent “insulting” memorandums to him, and “talk[ed] to him in a very insulting way over the telephone.” Although he was appointed administrative judge, he stated that he did not terminate Mr. John because he “didn’t think it was [his] place | g9to fire him at that time.”[30]
13nJudge Mulé further explained that Judge Johnson and Mr. John failed to inform him of a site visit to S.A.N.D. by the United States Department of Justice, Office of Justice Program.[31] He also testified .that Judge Johnson never complied with his request to see a copy of Mr. John’s contract in which his salary was increased from the original $40,000 per year to $67,000.
During her testimony, Judge Johnson denied that she failed to obey the orders of *426 Judge Mulé while he was acting as administrative judge. .
The conduct for which the Commission recommended discipline included Judge Johnson’s refusal or delay in turning over files or records to Judge Mulé (but not for omissions by Mr. John); all the alleged conduct that occurred after July 16, 2001, the date of this Court’s correspondence about the scope of Judge Mulé’s | S1 administrative duties; Judge Johnson’s meetings with accountants about S.A.N.D.’s finances; and Judge Johnson’s meetings with the federal government about the administration of grant funds as to S.A.N.D.
We disagree with the Commission that Judge Johnson’s meetings with the accountants, the United States Attorney’s Office, and the Federal Bureau of Investigation demonstrated a failure to cooperate with Judge Mulé. Prior to Judge Mulé’s appointment, an audit was underway, the state legislative, auditor was involved, and there were continuous allegations of mismanagement and/or misconduct regarding the federal funding obtained pursuant to the federal grant applied for by Judge Johnson on behalf of the Baton Rouge Parish Juvenile Court to establish the Drug Court. As a result of the expansive media reports suggesting mismanagement of federal funds, the United States Attorney’s Office, as well as the Federal Bureau of Investigation, became involved. Clearly, Judge Johnson’s presence during those meetings was required. Based on Judge Mulé’s own testimony, the representative from Justice Departhient initially declined to respond to his correspondence. Judge Mulé stated, “He didn’t know if I had authority to ask for this information. And then we had to advise him that I was the administrative judge of the court and that I was the person to have this information.” Additionally, Judge Mulé testified that the only cooperation he received concerning the drug court and S.A.N.D. came from Judge Johnson. He stated that Mr. John only provided the required documents when he was instructed to do so by Judge Johnson. It is clear from Judge Mulé’s testimony that he requested and welcomed Judge Johnson’s assistance in dealing with Mr. John.
Thus, the only evidence submitted to support the Commission’s contention that Judge Johnson failed to cooperate with Judge Mulé was (1) her failure to inform | ¡¡¡,.Judge Mulé of the meetings with the auditors, Justice Department, and the Federal Bureau of Investigation; and (2) her failure to provide Judge Mulé and the auditors with a copy of the latest contract which purported to increase Mr. John’s salary from $40,000 to $67,000.
While we believe that Judge Johnson should have advised Judge Mulé of the meetings and provided Judge Mulé with a copy if the contract, we find that the failure to do so does not rise to the level of judicial misconduct warranting discipline from this Court. Therefore, we decline to impose discipline relating to Charge 0206. Charge 0207
Charge 0207 involves Judge Johnson’s actions after being informed by Judge Mulé that S.A.N.D. would be closing and that hearings were required for ten juveniles who would be affected by the closure of S.A.N.D. Judge Mulé decided to close S.A.N.D. when its funding, which was obtained pursuant to the federal grant, was expended. By letter dated September 14, 2001, Judge Mulé informed Judge Johnson that S.A.N.D. would' be closing, stating:
You are aware that funding for the Drug Court Treatment Center will come to an end within a week or two.
I have been informed that there are 41 juveniles in the program, some in after *427 care and others requiring ongoing counseling. I, with James Boulware, have worked to place these juveniles in other programs, but to this date we have been successful in tentatively locating a facility for the top ten on the list furnished by the counselors. I have also asked the DPS/C to assist in a transition period.
In light of the above, it will be necessary for you to conduct further dispositional hearings. I am confident, with the assistance of Juvenile Services, that you will be successful in placing these juveniles.
* * *
By letter dated September 17, 2001, Judge Johnson responded to Judge Mulé [33as follows:
You have decided that the Drug Treatment Center should be closed; thus, you as the maker of that decision have the responsibility of finding treatment for the children and families who are currently receiving treatment. In fight of your decision to discontinue treatment for substance abusing children, I cannot assist you in depriving children of drug treatment.
judge Mulé interpreted Judge Johnson’s response as a refusal to conduct the dispo-sitional hearings.[32] Consequently, he reported such to this Court and Dr. laaCollins. Thereafter, this Court appointed Judge Ann Murry Keller of the Jefferson Parish Juvenile Court “for the purpose of expeditiously presiding over further dis-positional hearings for juveniles who are currently receiving treatment from the Straight and Narrow Drug Treatment Center.”
On September 27, 2001, Judge Keller went to the East Baton Rouge Parish Juvenile Court to conduct the hearings. Upon her arrival, she learned that the hearings she scheduled were not disposi-tional hearings, but rather, they were more in the nature of status hearings. Judge Keller testified:
Because when I had gotten there, Judge Mulé indicated to me that we weren’t looking for treatment programs or anything to put these kids into. We were just trying to get them back onto a regular court docket.
Judge Keller stated that the purpose of the status hearings was to ensure “that the cases were in the right posture to go wherever they needed to go and to do whatever they needed to do.” Judge Keller stated *428 that of the twenty to thirty cases on the docket that day, “some of them had been to disposition. Some had not been to disposition. Some had not been to adjudication.” She stated that she scheduled some of the cases for adjudication, some for disposition, and others for review of the disposition.
Judge Keller testified that during staffing meetings, which were held prior to the hearings which she was appointed to preside over, Judge Johnson appeared in court. She testified as follows:
Q. What about Judge Johnson, was she there?
A. She came in several times during the staffing, and would sit and make comments about the different cases. And tell me what needed to be done, or find something in the record for me that I needed to see, that I asked for.
ImQ. And when you were asking for it you were asking the staff to locate it?
A. Whoever, yes. And she would come up and take the record and find the thing for me, or give me information about background of the kid, or what needed to be done with the kid.
Q. And that was information you were looking to staff to report to you.
A. Basically. Well, I had not expected Judge Johnson to be there at all from what the indication was to me when I first talked to Mr. Palmatier [a deputy judicial administrator],
* H: *
Q. Now, in terms of Judge Johnson’s participation in these staffing meetings, what was her behavior like, if you could describe that?
A. Kind of take charge. She wasn’t there the entire time. She would occasionally walk through. And if, when she was walking through, if there was a question that I asked or something, she would provide the information or get it when I didn’t even know that she was actually in the room. I felt like her presence made the staff and everyone else very uncomfortable. I know it made me uncomfortable.
Judge Keller further testified that once the staffing meetings were completed, Judge Johnson remained in the audience of the courtroom. Judge Keller did not recall whether or not Judge Johnson made any comments on the record during the hearings. However, she did recall that Judge Johnson “would nod like I was doing the right thing.” Judge Keller testified that in the end she did what she was appointed to do and Judge Johnson’s presence in the courtroom did not interfere.
The record also contains a memorandum from James Boulware,[33] who was present during the hearings over which Judge Keller presided. Mr. Boulware ^provided his reflections of those hearings, stating:
[[Image here]]
Judge Johnson attended this review meeting and the entire hearing process. She commented out loud in the courtroom in connection with issues in the cases. She initially sat with the probation officers, treatment staff, myself, and Judge Mulé for a while. Then she went with the minute clerks and managed the records herself, voicing clarifications and observations. This was clearly not expected by Judge Keller or Judge Mulé. Judge Keller main *429 tained a calm and friendly demeanor while keeping charge of the reviews, yet politely incorporated] Judge Johnson’s comments, clarifications, and suggestions. Judge Keller met with us after-wards and indicated that she was “uncomfortable” with this turn of events.
[[Image here]]
(Emphasis in original). Mr. Boulware went on to describe Judge Johnson’s conduct as “patently intimidating.”
Our review of the transcript of the hearings conducted by Judge Keller reveals that Judge Johnson made a brief comment on the record as follows:
THE COURT: Which was the one you still had that needed the ...
[ASSISTANT DISTRICT ATTORNEY]: Lakisha Prelow.
JUDGE JOHNSON: Pre, Pre.
THE COURT: Pre ...
JUDGE JOHNSON: Pre, Pre ...
THE COURT: low?
JUDGE JOHNSON: P, ...
THE COURT: Prelow.
JUDGE JOHNSON: as in pretty.
[[Image here]]
THE COURT: How do ya’ll usually put it on the record?
|^UNIDENTIFIED VOICE: She needs to be sworn in?
THE COURT: Do you swear everybody at one time?
JUDGE JOHNSON: No, no, we just get an update report. If it becomes necessary to get additional testimony under oath, then we’ll do that.
THE COURT: All right....
At the hearings held before the Commission, Judge Johnson denied that she refused to schedule or hold additional dispo-sitional hearings for the juveniles affected by the closure of S.A.N.D. When asked what she meant by her letter to Judge Mulé saying she would not assist him when he asked her to conduct dispositional hearings, Judge Johnson replied:
I am informing Judge Mulé, telling him that it’s totally senseless, it makes no sense to close down a perfectly appropriate, well-operated treatment program because that’s something that James Boulware has in his mind and probably has convinced Judge Mulé of. I’m telling him that. I’m telling him that he can’t get me to go along with his plan to deny treatment for children, that he’s going to have to get some treatment for these children. That’s what I’m telling him.
I am venting my frustration with him for doing what he’s doing to these children and families. I am venting my frustration with him for that. I’m not in any way, not one sentence, not anywhere saying I’m going to refuse to do my job, because I’m going to do my job plus in light of the fact that they are depriving these children of the necessary treatment that they need. So I’m going to do that plus something else.
Judge Johnson also expressed that she did not think that her presence during the staffing meeting/hearings was awkward for Judge Keller; rather, “if anyone was going to be awkward, it would have been more awkward for me because you have somebody else coming in to do my docket or— and my children are looking at me and their parents are looking at me, what’s wrong, Judge, why are you not hearing my cases?” Judge Johnson testified that she remained in her courtroom to assist Judge |3SKeller and to reassure the parents and children present that day that everything was all right.
In its Findings of Fact and Conclusions of Law, the Commission stated:
*430 With regard to Formal Charge 0207, when Judge Mulé informed [Judge Johnson] he was closing down SAND and hearings were required to provide for alternate treatment for the juveniles in the program at that time, she put into writing her unwillingness to participate. She did this by letter of September 17, 2001, in response to a letter sent to her by Judge Mulé. Judge Johnson admitted at the hearing that she knew in advance of Judge Ann Murry Keller’s expected arrival to conduct dispositional hearings because Judge Mulé had told her about it. If Judge Mulé’s interpretation of Judge Johnson’s letter was incorrect and Judge Johnson was willing to conduct the necessary proceedings, Judge Johnson’s prior knowledge of Judge Keller’s arrival provided to her time to disabuse Judge Mulé of his erroneous notion and to arrange to conduct the dispositional or status hearings herself. Judge Johnson’s testimony was not credible that she had not refused to conduct these proceedings as Judge Mulé contended. Her refusal to cooperate constituted a violation of Canons 1, 2 A, 3 A(7) (failure to preform duties) and 3 B(l)(failure to cooperate), as well as willful misconduct relating to her official duty and a failure to perform her duty, in each case in violation of 1974 La. Const, art. 25(C).
The Commission further concluded that “it was wrong” for Judge Johnson to attend court while Judge Keller was presiding over the hearings, as her attendance “placed Judge Keller in an untenable position, and caused other participants in the proceedings to defer to Judge Johnson.”
It is unquestionable that Judge Johnson’s decision to attend the hearings over which Judge Keller presided was ill-advised. Nevertheless, there is nothing in our rules or the language of the order to indicate that Judge Johnson was not allowed to attend the hearings. By Judge Keller’s own testimony, Judge Johnson remained courteous and helpful. As a result, nothing in the record before us convinces us that Judge Johnson’s conduct rose to the level of judicial misconduct.
IsflMoreover, the evidence does not establish that Judge Johnson refused to conduct any “dispositional” hearings. When questioned about the nature of the hearings conducted by Judge Keller, Judge Mulé testified as follows:
Q. Was it not a fact that all Judge Keller did was sit in on the regularly scheduled status conference hearings?
A. I don’t know.
Q. If Judge Johnson were to testify that the only thing that Judge Keller did was to come to the court and sit in on the regular status conference hearings that she had already scheduled, would you be able to say that was not true.
A. I can’t say. I can’t answer that.
Q. You can’t answer that?
A. I don’t know what Judge Johnson had scheduled. I don’t know what Judge Keller did, whether it was a dis-positional or a status conference. I’m not — I don’t know what that was.
Nevertheless, it is clear from the language of Judge Johnson’s letter to Judge Mulé that she refused to comply with Judge Mulé’s attempt to obtain her cooperation in facilitating the closure of the treatment center. She stated, “In light of your decision to discontinue treatment for substance abusing children, I cannot assist you in depriving children of drug treatment.” Judge Johnson admitted that her response stemmed from frustration. Regardless of the source of her response and whether the hearings at issue were in the nature of status hearings or dispositional hearings, we find that the evidence supports the Commission’s conclusion that *431 Judge Johnson’s failure to conduct the hearings constitutes a violation of Canons 1 and 3 B(l) of the Code of Judicial Conduct, as well as La. Const, art. V, § 25(C).
Accordingly, the only remaining issue before this Court is the appropriate sanction. Judge Johnson vigorously challenges the Commission’s recommendation of a suspension of sixty days. In determining an appropriate sanction, we are Incognizant of the principle that the primary purpose of the Code of Judicial Conduct is to protect the public rather than simply to discipline judges. In re Clark, 2003-2920 (La.2/20/04), 866 So.2d 782; In re Harris, 98-0570 (La.7/8/98), 713 So.2d 1138; In re Marullo, 96-2222 (La.4/8/97), 692 So.2d 1019.
Pursuant to La. Const, art. V, § 25(C), on the recommendation of the Judiciary Commission, this court may censure, suspend with or without salary, remove from office, or retire involuntarily any judge for willful conduct relating to his or her official duty. In this case, the Commission has recommended that Judge Johnson be suspended for sixty days, without salary, and be ordered to pay costs. We find that Judge Johnson’s conduct in refusing to comply with Judge Mule’s request that she conduct the hearings warrants public censure.

Costs

The Commission further recommends that Judge Johnson be ordered to reimburse the Commission $7,288.32, the total cost incurred in connection with the proven charges, pursuant to Supreme Court Rule XXIII, Section 22. According to the Commission, the costs associated with the unproven charges were excised from the total.
Judge Johnson disputed the Commission’s assertion that the costs for the unproven charges were excised from the total. Counsel for Judge Johnson directs this Court to specific items in the record which relate to both proven and unproven charges, items which relate to unproven charges, as well as items which omit a reference to any specific charge. Counsel further notes that while the Commission excised over one-half of the transcript, the Commission continues to maintain its request to be reimbursed for costs associated with unproven charges.
We remand this matter to the Commission for purposes of recalculating the 141 costs to reflect only those items which relate to proven charges, including transcript costs. Because we have determined that Charges 0150 and 0206 were not proven by clear and convincing evidence, all costs associated with those charges are not to be assessed to Judge Johnson.
VICTORY, J., dissents and assigns reasons.

. Judge Johnson was initially elected to fill a partial term. She was reelected, without opposition to a full six-year term in October 1996. She was reelected by a majority vote in October 2002.

. Another anonymous complaint was filed on March 12, 2001, alleging that Judge Johnson failed to sign three non-support judgments in a timely manner.

. Canon 3 A(7) of the Code of Judicial Conduct provides:
A judge shall dispose of all judicial mat- , ters promptly, efficiently and fairly.
Canon 3 B(l) of the Code of Judicial Conduct provides: /
' A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.
Canon 1 of the Code of Judicial Conduct provides:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code are to be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
Canon 2 A of the Code of Judicial Conduct provides:
A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

. La. Const. art. V, § 25(C) provides, in pertinent part:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute....

. See footnote 3.

. See footnote 3.

. Canon 3 A(3) of the Code of Judicial Conduct provides:
A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge’s direction and control.

. Canon 3 B(l) of the Code of Judicial Conduct provides:
A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice arid maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.

. The Commission did not find that Canon 3 B(2), which provides, "A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties,” was violated, because "the *413 employee in question” was then under the supervision of Judge Mulé — not Judge Johnson. The "employee in question” presumably refers to Peter John, whose position will be discussed infra.

. LSA-Ch.C. art. 423 provides, in pertinent part:
A. (1) The judge or judges of the court may appoint one or more hearing officers to hear child support and support-related matters and to conduct preadjudication hearings and resolve matters preliminary to adjudication in any proceeding authorized by this Code....
C. The hearing officer shall perform such duties as are assigned in accordance with local rules not inconsistent with this Article or with the constitution and laws of the state, including:
(1) Administering oaths.
(2) Compelling the attendance of witnesses and issuing subpoenas.
(3) Taking testimony.
(4) Making a record of the hearings.
(5) Summarizing testimony, making findings of fact, and submitting a written recommendation to the court concerning the disposition of the assigned matter.
(6) Hearing and making recommendations on all restraining orders and protective orders filed in accordance with Articles 1569 and 1570.
D. In the performance of any judicial assignment, the hearing officer shall be bound by the provisions of this Code governing the authority and responsibility of a juvenile court judge.
E. The hearing officer shall file his report and recommendations with the court, and a copy shall be promptly provided to all parties or their counsel of record either at the hearing or by mail.
F. Within ten days after transmittal of the hearing officer's report and recommendation, any aggrieved party may serve and file objections in writing to findings or recommendations. The court will then hear the case de novo and enter judgment. For hearings utilizing the expedited process for establishment of paternity and establishment or enforcement of support, the delay for serving and filing objections shall be established pursuant to local rule as provided in R.S. 46:236.5.
G. If no objection has been timely filed and if the court approves the hearing officer's findings and recommendations, the court shall enter the proposed order as the judgment of the court which thereafter may be appealed in the same manner as any other appeal from any other judgment of the court.

. During oral argument in this matter, there appeared to be some confusion surrounding the concept of “hard" judgments versus "soft" judgments. During the hearing, Mr. Bella described “hard" judgments as the initial orders setting the child support and/or *415 modifications to child support. Mr. Bella further testified that "soft” judgments were prepared pertaining to preliminary matters which did not involve actual support orders.

. Pursuant to LSA-R.S. 46:236.6, a defendant who violates the terms of a child support order requiring him/her to pay child support is entitled to a show cause hearing, and the Department of Social Services or the district *416 attorney "shall file with the court and serve in open court on the defendant a rule for contempt, setting forth the terms of the original court order for child support and all modifications thereof, along with the allegations purporting to place the defendant in contempt.”

. Ms. Burden, a practicing attorney in East Baton Rouge Parish, often sat ad hoc for both judges in East Baton Rouge Parish Juvenile Court.

. Ms. Burden's testimony contradicts the Commission's contention that Ms. Burden “found a stack of judgments awaiting signature in Judge Johnson's chambers when she substituted for her in July 1999." The testimony was as follows:
Q. Okay. And as I understand your testimony, you don’t know — those judgments that you signed were not sitting in Judge Johnson's office when you executed them?
A. That’s correct.
Q. They were brought to you by whom?
A. Mike Smith and Patrick Bella.
Q. You don't know whether these judgments were at the non support clerk's desk for any length of time?
A. I don’t know where they were.
Q. You don't know if they were in Doug Welbourn’s [the East Baton Rouge Parish Clerk of Court] office for any period of time?
A. I don’t know where they were.
Q. You don’t know whether they were in Mr. Bella’s office for any period of time?
A. I don't know where they were.
In its Findings of Fact and Conclusions of Law, the Commission also stated that when Ms. Burden sat ad hoc for Judge Johnson in April 2000, she "discovered another stack of unsigned judgments.” As noted, infra, Ms. Burden testified that there was "a large number of files stacked in a chair.” There was no testimony to indicate that the "files” constituted unsigned non-support judgments.

. Indeed, it is apparent from Mr. Bella's testimony that he has somewhat of an inflated view of his role as a hearing officer. During his direct testimony, Mr. Bella testified about "appeal delays” for parties to "appeal” his recommendation. On cross-examination, however, Mr. Bella conceded that the “appeal delays” he referred to were actually time delays for filing objections to his recommendations.

. LA ST S CT GEN ADMIN R PART G, § 2 provides, in pertinent part:
(a) When Submitted. A case or other matter shall be considered as fully submitted for decision to the trial judge, and should be decided, immediately upon the conclusion of trial or hearing, and judgment signed expeditiously thereafter.
[[Image here]]
(b) Reports. Each judge of a district, juvenile, family, parish, city municipal or traffic court shall report to this court, through the office of Judicial Administrator, on or before the tenth day of each month, all cases which have been fully submitted and under advisement for longer than thirty days, together with an explanation of the reasons for any delay and an expected date of decision.

. Judge Emanuel was also charged with failure to issue scheduling orders or conduct status conferences, failure to sign routine orders while serving as the duty judge,

. During Mr. Smith’s testimony, Judge Giar-russo, Chair for the Judiciary Commission, stated:
The attorneys have agreed to stipulate that if we went through each one of these records that there would be nothing in the record that could indicate when the judge received the judgment to sign nor how long they stayed in her office.

. During the meeting, Judge Richey stated, “The problem, though, is that when there are, you know, problems in the judgment, I go over it and I send it back, and then it may be another month before I get it back and correct it.” Judge Richey expressed her concern that if a proposed judgment was date stamped July, for instance, and was subsequently sent back to the district attorney's office and not returned until September, then it would appear as if she had held the judgment from July until September.

. Testimony at the hearing established that the East Baton Rouge Juvenile Court currently uses a “minute entry judgment,” which has eliminated the need to date stamp the proposed judgments. The judgments are now stamped when the judge actually signs them. Additionally, the district attorney’s office no longer prepares proposed judgments.

. Moreover, the Commission's contention, that the delay in signing the thirty-six judgments “posed a very real risk that parents in need of child support would not get needed support, although the other parent had already paid it” is not supported by the record. Our review of the record before us reveals that thirteen of the thirty-six cases were contempt of court matters; six of the matters were dismissals; four involved deferred execution of sentencing matters; two were hied to amend the payee and the caption;- and eleven were either payment determination/increase hearings or proceedings under the Uniform Reciprocal Enforcement of Support Act.

. Judge Mulé- served as an Orleans Parish Juvenile Court judge for twenty-four years.

. Judge Mule’s appointment was subsequently extended numerous times, and he served as Supernumerary Judge pro tempore from February 2001 through October 15, 2003.

. A sketch of the relevant events may be obtained from this Court's per curiam in In Re Johnson, 2000-0392 (La.6/30/00), 767 So.2d 2.

. The dispute over who would be the Chief Judge was resolved by the promulgation of East Baton Rouge Juvenile Court Rule 40.1, which provides in pertinent part:
[[Image here]]
C. "Chief Judge"' — In even-numbered years, the Judge of Division "A” shall serve as Chief Judge. In odd-numbered years, the Judge of Division "B” shall serve as Chief Judge. The Judges shall concur on the exercise of administrative authority regarding matters related to the operation of the Court.
[[Image here]]

. On February 22, 2001, shortly after Judge Mule’s appointment, in a memorandum directed to Donna Carter dated, Judge Johnson wrote:
It has been brought to my attention that you have requested information from the Straight and Narrow Drug Treatment Center regarding Workers' Compensation and the Cafeteria Plan for tax and auditing purposes. As the chief judge, I should be made aware of any and all requests for information made by you or members of your staff to either S.A.N.D. or anyone else for that matter. Therefore, you are to provide me as well as the Administrative Judge (Mulé) with copies of all requests for information sent to your office.
Emphasis added.

. The memorandum stated:
Please explain the nature of the cited debt, the period of time from which this debt was incurred. I am of the understanding that all reimbursements, which are due the court, were previously paid. If I have a misunderstanding of the above, please clear my understanding as it relates to what reimbursements were made. Please provide this information to me not later than Wednesday March 21, 2001.

. Those present at the meeting were Judge Mulé, Judge Richey, Donna Carter, and Darlene Kaufman.
On June 22, 2001, Judge Johnson wrote a memorandum to Judge Mulé, explaining her absence from the en banc meeting. Judge Johnson stated:
I found it absolutely impossible to brake [sic] away on yesterday at noon for the scheduled meeting. I found myself in a position of deciding to leave a courtroom full of parents and children to brake [sic] away for the meeting or take care of the children and families. Needless to say[,] I chose to take care of the children and families with full knowledge that there was nothing specific on the agenda, which required action, and if so[,] we could meet at anytime.
* * *

. The Commission did not recommend discipline because Judge Johnson referred to herself as "Chief Judge” for a short period of time following Judge Mulé's appointment, but noted that the testimony in this regard "provided insights to the Commission about Judge Johnson’s attitudes and actions.”

. The colloquy was as follows:
Q. Why didn't you fire him?
A. When I first got there, I didn’t know anything at all about the drug court and I didn't know too much about what was going on. And I just thought that I could — as I got there — the little longer I stayed, I thought that I could work with the individual.
Q. But at some point you figured out that you couldn't; didn’t you?
A. Yeah.
Q. The Supreme Court put you in charge; did it not?
A. Yes.
Q. The Supreme Court ... wrote you a letter making it specifically clear to everybody including Peter John that you were in charge; did it not?
A. Correct.
Q. Why didn’t you fire him?
[[Image here]]
A. I didn't think it was my place to fire him at that time. I was also asked why didn’t I hold him in contempt of court, and I just didn't feel that that was the proper thing to do.
Q. Well, what did you think that Judge Johnson could do with him after you were in charge?
A. Well, since she had hired him and knew him better than I did, I thought that she would have greater influence over him. And I was hoping that she could persuade him to be more cooperative.
Q. But you were asked a series of questions with respect to the letters that Judge Johnson wrote to Mr. Peter John saying that she had no authority to do that. Did she have authority?
A. No, not really.
Q. Well, when you were expecting her to try to get his cooperation, exactly what did you expect her to do.
A. Do what she did, to write to him and talk to him since she knew him better than I did. And I thought that she would be the person that could persuade him to change his ways.
[[Image here]]
Q. Did [Judge Johnson] violate the mandate from the Supreme Court in your view by simply contacting Peter John?
A. No.

. Judge Mulé testified that the United States Attorney’s Office and the Federal Bureau of Investigation investigated allegations of misconduct and/or mismanagement of the S.A.N.D. program. -Both agencies concluded that “if there [were] any problems, that it was not on the local level, but it emanated from Washington, D.C.”

. According to Judge Mulé, a disposition hearing follows an adjudication and is the equivalent to a sentencing hearing in the adult criminal system. LSA-Ch.C. art. 893 provides:
A. At the disposition hearing, unless the child waives the presentation, the court shall hear evidence as to whether the child is in need of treatment or rehabilitation and shall make and file its findings.
B. All evidence helpful in determining the proper disposition, including oral and written reports, the report of the predisposition investigation, any reports of mental evaluation, and all other evidence offered by the child or the state shall be received by the court and may be relied upon to the extent of its probative value even though not admissible at the adjudication hearing. Upon motion of the district attorney or the child, the court may hear testimony from the victim of the offense.
C. Counsel for the state and for the child shall be afforded an opportunity to present evidence and to examine and controvert written reports so received and to cross-examine individuals preparing the reports or other witnesses who give testimony at the hearing. Sources of confidential information need not be disclosed.
D. If the court finds that the child is in need of treatment or rehabilitation as a delinquent child, the court shall proceed immediately to make any appropriate disposition authorized by Articles 895 through 899.

. Judge Keller testified that she requested Mr. Boulware’s presence at the hearings because she “thought we were going to be doing something with the drug court situation. And he had helped create our drug court. So I thought it would be helpful if he was there if I needed any suggestions.”